Dr. Radford Barnes, Dr. Waters Paul, and James Harpole (State of Alabama employees) appeal from a judgment in favor of Emmett O. Dale, as administrator of the estate of Patrick F. Dale, deceased. The administrator filed a wrongful death suit against the appellants for the allegedly negligent and wanton treatment and release of Douglas Edward Griffin from the substance abuse unit at Bryce Hospital — a *Page 772 
mental health facility owned and operated by the State of Alabama. Seventy-two days after his discharge from Bryce, Griffin shot and killed Patrick Dale. The ultimate issue here presented is whether the trial court erred in rejecting the defendants' "qualified immunity" defense. We hold that it did so err; we reverse the judgment and render judgment for the defendants. (We also address, preliminarily, whether the appellants preserved the "immunity" issue for appellate review.)
The facts of this civil appeal and its criminal predecessor are complex and detailed. (The record of Griffin's criminal trial was made a part of the record in this case.[1]) We will not undertake an exhaustive review of Douglas Griffin's troubled life before his commitment to Bryce Hospital, other than to note that he had a long history of alcoholism. The issues raised on appeal, however, do require a factual review of Griffin's admission, treatment, and discharge from Bryce; the procedural steps of the trial; and the professional background and employment of each of the appellants. It is to these areas that we now turn our attention.
 GRIFFIN'S COMMITMENT TO BRYCE
Griffin's alcoholism and substance abuse since 1977 led to his civil commitment to the Bryce facility on April 11, 1983, by the Fayette County Probate Court on a petition filed by the Northwest Alabama Mental Health Center. Upon his admission to Bryce, Griffin was examined by a staff physician and a staff psychiatrist; the staff psychiatrist entered an initial diagnosis of "adjustment reaction (stress reaction) with mixed emotional disturbance" and continuous alcohol dependence. Griffin was given the prescription drug Ludiomil for depression. His initial treatment plan listed the following criteria to be met for his release: Active involvement in the substance abuse program; control of depression for one month; willingness to attend recommended follow-up by a community mental health center for regulation and supervision of medication; and possible involvement with Alcoholics Anonymous.
The Bryce Substance Abuse Unit (the unit) provides specialized treatment to persons requiring short-term residential services for substance abuse problems. The unit averages 300 admissions and discharges per year, or about 25 admissions and discharges per month. At the time of Griffin's admission, James Harpole was coordinator of the unit; Dr. Paul was employed as a clinical psychologist in the unit; and Dr. Barnes was employed as a medical doctor assigned to the unit as "administrator," with authority to sign admission and discharge papers.[2]
Each admittee is assigned to an interdisciplinary treatment team, which examines and evaluates the patient; gathers relevant history on the patient; formulates and administers a treatment plan; and assesses the patient's progress. Griffin's unit treatment team was comprised of Harpole; Dr. Paul; Dr. Barnes; Dr. Sally Watkins, Terry Aplin, and Sheila Blacksher (social workers); Barbara Kemp (a nurse); and Sharon Bowden (a qualified mental health professional). *Page 773 
On April 18, the treatment team met with Griffin to assess his current status and formulate a master treatment plan to identify his existing problems and provide any assistance that could facilitate his eventual discharge from the unit. The team, aware of Griffin's history of alcoholism, substance abuse, past treatment, and his personal and work life, identified a "working diagnosis" of "alcohol dependence and substance abuse" as his only psychiatric/psychological problem. Short term goals set for Griffin included achievement of "level III," which would provide him with a greater degree of hospital liberty and with job skills evaluation. Long term goals sought to have Griffin remain alcohol and drug free; develop independent living skills; and establish a work history. Criteria for Griffin's final release from Bryce included remaining alcohol and drug free; achieving "level III"; contacting a community mental health center for follow-up treatment; and having a job placement. Griffin's estimated release date of June 1, 1983, as set forth in the initial treatment plan, was left unchanged by the team.
After admission, Griffin was administered a battery of psychological tests to provide an indication of his current level of intellectual functioning, the presence or absence of organic disturbance, and personality structure or functioning. The psychologist's report, in addition to emphasizing Griffin's alcoholism, stated that he did not exhibit the type of thought disorders typically found in schizophrenic or psychotic individuals, but noted his antisocial behavior and tendency to blame others for his problems.
On April 22, 1983, the Northwest Alabama Mental Health Center reported to Harpole that Griffin's wife had received a handwritten letter from Griffin. The letter stated that he was "feeling bad [and] they are giving me [something] and it makes me [sick]"; that "I love you so much I am going to kill myself but [first] I am going to kill a lot of [people] it [might] not be you I don't know"; that "I think bad but try not to but I can't"; that "I love you and the kids but don't [know] what will happen so look out if I [sneak] out of here"; and that "I am not going to be here long [because] I am going to [sneak] out."
A private psychiatrist, employed by Bryce, evaluated Griffin on the evening of April 22 to determine whether Griffin was a threat to himself or others and whether the substance abuse unit was the most appropriate placement for him in light of the letter. Griffin denied that the threat was serious, indicated that he had no intention of killing anyone, and stated that he planned to remain at Bryce and complete treatment. Griffin was placed in a secure ward under close observation; the staff psychiatrist who examined Griffin at the time of his admission to Bryce evaluated Griffin on April 26 and, in conjunction with the private psychiatrist's notes and conversations with Griffin, concluded that he was not a suicide or homicide risk. Griffin was then transferred back to the unit.
Griffin requested discharge from Bryce in late April or early May of 1983. The treatment team believed that Griffin had experienced a significant change in his response to the treatment program after the letter incident. He recognized that marital difficulty was a central factor in his behavior; and he expressed his intention to seek vocational training, to affiliate with a community health center, and to refrain from using alcohol and drugs. Before acting on Griffin's discharge request, however, the treatment team referred him to the staff psychiatrist, who had twice examined him, for further psychiatric evaluation.
The staff psychiatrist concluded that Griffin was competent, not suicidal, not depressed, and not a danger to himself or others. In response to questions from the treatment team, the psychiatrist affirmed that Griffin was competent to make decisions and was able to be released from Bryce. The treatment team considered Griffin's progress to have been adequate and consistent with the goal that he attain "level III," as provided in the treatment plan; it was also felt that Griffin did not have any "mental problems" other than his drinking and related behavior. *Page 774 
On May 4, 1983, Griffin was released from Bryce into the custody of his father. Dr. Barnes signed the discharge papers and provided Griffin with a two-week supply of Ludiomil, the antidepressant prescribed for Griffin at the time of his admission to Bryce. At the time of his discharge, Griffin's prognosis for "staying off alcohol" in the future was "guarded."
 EVENTS AFTER GRIFFIN'S DISCHARGE
Griffin made initial contact with the Southwest Alabama Mental Health Center in Evergreen on May 5, 1983, requested continuation of the prescription for Ludiomil, and stated that he was going to Chicago to live with relatives. He apparently went to Chicago but returned to Evergreen within three to four weeks and again appeared at the mental health center. The center referred Griffin to an Evergreen physician, who issued a prescription for Ludiomil. About one week later, a treatment coordinator at the mental health center referred him to a second physician, who continued Griffin on Ludiomil with an added prescription of Serax.
Griffin contacted the Bryce Hospital legal aid office in June for assistance in his divorce proceedings, then pending in Fayette County. In mid-June, his court-appointed lawyer requested the Fayette County Circuit Court to grant her leave to withdraw as Griffin's counsel on grounds that he was not then competent to assist his lawyer; was unable to understand and make rational decisions; and, due to his mental condition, was unable to maintain a lawyer-client relationship. The documents from the lawyer were made a part of Griffin's medical records at Bryce, but they did not come to the attention of Harpole, the unit coordinator.
The events of July 15, 1983, are summarized by the Court of Criminal Appeals in Griffin v. State, 500 So.2d 83, at 85-87 (Ala.Cr.App. 1986), as follows:
 "On July 15, 1983, the deceased victim, Patrick Dale, accompanied by his mother and a friend, went to the Holiday Inn Lounge in Evergreen. The appellant solicited and procured a ride home with Patrick Dale in exchange for five dollars worth of gas. After their departure from the Holiday Inn Lounge, in Dale's car, [Griffin] shot and killed the deceased on a Wilcox County road.
 "[Griffin] also stole the deceased's car and thereafter drove the car to the Chaparral Club in the Nortport-Tuscaloosa area. Upon his arrival, [Griffin] telephoned Iris Dollar, who later met him at the Chaparral Club. [Griffin] spent the next two nights with Iris Dollar in Tuscaloosa. Reuben Cunningham, the son-in-law of Iris Dollar, purchased the deceased's car from [Griffin] for a price of $200.00. Both Cunningham and Dollar testified that they had observed the shotgun in the car prior to his making the purchase. [Griffin] returned to Evergreen by bus after spending two days in Tuscaloosa.
". . . .
 "[Griffin] was admitted to Evergreen Hospital after an apparent suicide attempt by consumption of alcohol and an overdose of drugs. He was discharged from the hospital with instructions to take medication for five days. On July 22, 1983, the day following his discharge, [Griffin] was arrested. On July 25, 1983, (Griffin) was interviewed by Investigator Gibson and Sheriff Arnold, and gave a statement, which he signed after making a few corrections."
Griffin was convicted in the Wilcox County Circuit Court of murder during the course of committing a robbery. At the time of trial in the instant civil case, Griffin was confined to the prison system's Holman Unit in Atmore, serving a sentence of life imprisonment without parole.
 THE PROCEEDINGS BELOW
The complaint, filed by Emmett Dale on January 28, 1985, alleged that, prior to July 15, 1983, Douglas Griffin had had "a history of unsuccessful attempts to commit suicide; was a known drug addict; was a known abuser of alcoholic beverages and prescription drugs; was known to be a violent and dangerous person who was dangerous *Page 775 
to himself and to others"; and had had "a known and recorded history of having been convicted of numerous criminal offenses in the State of Alabama."
The complaint alleged that the defendants had "a duty to protect the general public, including Patrick Frank Dale, from Douglas Edward Griffin and to prevent Douglas Edward Griffin from committing violent criminal acts upon the general public, including Patrick Frank Dale." The complaint further charged that the defendants had actual or imputed knowledge of Griffin's violent propensities and the fact that he was "a dangerous person," but "negligently failed to provide proper psychiatric care"; that the defendants "negligently discharged" him into the community where Patrick Dale resided; and that the defendants negligently released Griffin from Bryce and failed to perform a legal duty to another party at a time when they knew or reasonably should have known that Griffin was dangerous to persons with whom he was expected to come into contact after his release.
Dr. Barnes moved to dismiss the complaint on August 1, 1985, and stated, in part, that he was entitled to qualified immunity from monetary damages by virtue of the Alabama Constitution's prohibition of suit against a defendant acting in his official capacity as an agent or employee of the Department of Mental Health and Mental Retardation; the motion was denied, and Barnes answered the complaint on September 9, 1985, again raising "qualified immunity" as an affirmative defense.
Harpole and Dr. Paul answered the complaint on January 3, 1986, and raised "qualified immunity" as an affirmative defense. Harpole, Dr. Barnes, and Dr. Paul moved for summary judgment on January 13, 1987, based on the pleadings, discovery materials filed, and applicable Alabama law. The trial court denied the motion, but noted in its pre-trial order the defendants' "qualified immunity" defense and their contention that the discharge of Griffin from Bryce was appropriate and legally required.
At the close of the plaintiff's evidence, the defendants moved for a directed verdict on each of the theories of the claim. The motion stated that Dale had failed to establish their negligence in treating and releasing Griffin; that intervening causes had produced the death of Patrick Dale after the negligence, if any, of the three defendants; that Patrick Dale negligently contributed to his own death; and that the three defendants, as employees of the State of Alabama, were entitled, as a matter of law, to qualified immunity from liability.
The trial court denied the motion, and subsequently instructed the jury that, for it to find the defendants negligent under this theory of liability, it "must be reasonably satisfied that Douglas Edward Griffin's release would cause a substantial risk of harm to persons such as Patrick Frank Dale." The defendants did not object to this jury instruction.
The jury returned verdicts in the following amounts: $5 million against Douglas Griffin; and $2.25 million each against Harpole, Dr. Barnes, and Dr. Paul, for a total award of $11.75 million in favor of Dale. Judgment was entered by the trial court in accordance with the verdicts on the same day. The three state employees timely filed a Rule 50 (b), A.R.Civ.P., motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial or remittitur. The defendants' motion for JNOV again raised the legal defense of immunity. Upon hearing the motion, however, the trial court apparently refused to consider the JNOV motion, believing that the defendants had waived their right to JNOV relief by their failure to refile a directed verdict motion at the close of all the evidence. Thereupon, the defendants withdrew their JNOV motion and the trial court treated the motion as one for new trial and for remittitur.
 I.
The preliminary issue tests this Court's ability to review a trial court's denial of a directed verdict motion made at the close of the plaintiff's evidence, which raises, as a legal defense, a pure question of *Page 776 
law, where the moving party fails to renew the motion for directed verdict on the same ground at the close of all the evidence. We hold that where, as here, all of the evidence bearing on the legal defense of "qualified immunity" was before the trial court at the close of the plaintiff's case-in-chief, and the otherwise properly preserved issue is found to be substantively valid, the appellate court is authorized to direct a judgment contrary to the jury's verdict.
Because of the plaintiff's insistence that the defendants have waived their right to raise the immunity issue as a basis for reversal of the judgment appealed from, we begin our discussion with an analysis of Rule 50 (b), A.R.Civ.P. A post-trial motion for JNOV, like a trial motion for directed verdict, is the proper procedural device for challenging, among other things, evidential sufficiency, and permits the trial court to revisit its earlier ruling denying the motion for directed verdict. Coastal ConcreteCo. v. Patterson, 503 So.2d 824 (Ala. 1987). It is a procedural absolute that a motion for JNOV, based on the "insufficiency of the evidence," is improper, if the party has not moved for a directed verdict on the same ground at the close of all the evidence. Sunshine Homes, Inc. v. Newton, 443 So.2d 921 (Ala. 1983); and Rule 50, A.R.Civ.P.
Technically, a party has waived his right to a directed verdict on the ground of "insufficiency," if the motion is made at the close of his opponent's case but he thereafter presents evidence in his own behalf. 9 C. Wright A. Miller, Federal Practice andProcedure § 2534 (1971). One who has moved for directed verdict at the close of his opponent's case is entitled to a review of the "sufficiency of the evidence" issue and relief from the jury's verdict, either by post-judgment motion for JNOV or by appeal, only if he moves again for a directed verdict at the close of all the evidence. Alford v. Dobbs, 477 So.2d 348 (Ala. 1985); Perdue v. Gates, 403 So.2d 165 (Ala. 1981); McDonald'sCorp. v. Grissom, 402 So.2d 953 (Ala. 1981); Great Atlantic Pac. Tea Co. v. Sealy, 374 So.2d 877 (Ala. 1979); and State v.Long, 344 So.2d 754 (Ala. 1977); DeMarines v. KLM Royal DutchAirlines, 580 F.2d 1193 (3d Cir. 1978); Travelers Insurance Co.v. Stanley, 252 F.2d 115 (5th Cir. 1958); and O'Malley v. Cover,221 F.2d 156 (8th Cir. 1955). See, also, King Mines Resort, Inc.v. Malachi Mining Minerals, Inc., 518 So.2d 714 (Ala. 1987).
These Rule 50 propositions form the basis of the plaintiff's two-pronged procedural argument for affirmance: First, he contends that, because the defendants failed to renew their directed verdict motion at the close of all the evidence, post-judgment JNOV relief is unavailable to them, and thus, that the issue here presented is likewise not reviewable on appeal; and second, given the defendants' noncompliance with Rule 50, the plaintiff contends that the defendants' failure to object to the trial court's jury instructions on the elements of "legal duty" and "proximate cause" waived any alleged error, and thus, that the jury instructions became the "law of the case" by consent.
We disagree and hold that a question of law addressed to the trial court at the close of the plaintiff's evidence, which strikes at the heart of the cause of action, need not, under all circumstances, be renewed at the close of all the evidence as a prerequisite to appellate review of the same question. This interpretation, rejecting the application of the "strict renewal" requirement of Rule 50 (b) to the case as here postured, is based on four considerations.
First, the plaintiff's argument overlooks the limited ground on which Rule 50's two-step requirement (i.e., a directed verdict motion at the close of all the evidence, followed by a post-judgment motion for JNOV) is premised. As our Rule 50 discussion indicates, each referenced proposition embracing the two-step procedure is expressly restricted to the "insufficiency of the evidence" ground. The policy considerations underlying the rule are obvious: Initially, the trial court is not fully prepared to determine the "insufficiency" issue (i.e., the lack of proof) until the close of all the evidence; and it is the wisdom of the revisit *Page 777 
requirement that the motion for JNOV affords the trial judge a second look at the "insufficiency" ground as a prerequisite for appellate review of the issue. No revisit prerequisite, however, is built into Rule 50 with respect to rulings on pure questions of law. While questions of law must be clearly raised and presented, and only adverse rulings with respect to those issues are reviewable on appeal, repeated adverse rulings on pure questions of law are not ordinarily required for appellate review of those same issues.
The plaintiff's "law of the case" argument fails for the same basic reason as does his "Rule 50" argument. Once an adverse ruling is made on a pure question of law, and the issue is properly preserved, the nonprevailing party has no choice but to proceed with the trial of the remaining issues. Except for grounds of "insufficiency of the evidence" in support of a motion for JNOV, and "weight of the evidence" in support of a motion for JNOV, and "weight of the evidence" in support of a motion for new trial, and other issues on which there has been no previous adverse ruling, such as excessiveness of the verdict, we know of no requirement for a party to renew his objection by way of a post-judgment JNOV motion on a pure question of law that had been previously objected to and ruled upon adversely by the trial court. See Woodham v. New York Times Broadcasting Service, Inc.,526 So.2d 5 (Ala. 1988). We hold that the defendants did not waive the immunity defense, under the circumstances of this case, by failing to object to the trial court's instructions on "legal duty" and "proximate cause."
Second, our rejection of Rule 50's "renewal" requirement, under the facts of this case, promotes the orderly administration of justice. The Alabama Rules of Civil Procedure are construed to "secure the just, speedy and inexpensive determination of every action." Rule 1 (c), A.R.Civ.P. Thus, formality is subordinate to the substantive interests of the parties. See Ex parte Moore,382 So.2d 548 (Ala. 1980).
We do not achieve the goal of Rule 1 by foreclosing a party's opportunity for appellate review of a pure question of law due to his failure either to renew a directed verdict motion or to file a Rule 50 motion for JNOV; to so foreclose that opportunity denies the "substantive rights" of a party whose legal claim or defense is fully ripened under the evidence, where the opposing party's claim or defense is barred as a matter of law, and thwarts the purpose of procedural rules. See Note, "Preservation of Judgment N.O.V.," 70 Iowa L.Rev. 269 (1984); see, also,McArdle v. State, 408 So.2d 491 (Ala. 1981). Therefore, under the narrow circumstances of this case, our holding is not a procedural deviation from the letter and spirit of Rule 50 (b) and the comments to the Rule.
Third, the failure to renew a directed verdict motion based on a question of law at the close of all evidence does not violate the constitutional prohibition against a court's reexamining facts tried by a jury. Alabama Const. of 1901, art. 1, § 11; and U.S. Const. amend. VII.[3]
One of the chief aims of the constitutionally protected "right to trial by jury" is to retain the common-law distinction between the province of the trial court and that of the jury, whereby, absent an express or implied consent to the contrary, issues of law are to be resolved by the trial court and issues of fact are to be resolved by the jury pursuant to instructions by the court.Baltimore Carolina Line v. Redman, *Page 778 295 U.S. 654, 657, 55 S.Ct. 890, 891-92, 79 L.Ed. 1636 (1935):
 "At common law there was a well-established practice of reserving questions of law arising during trials by jury and of taking verdicts subject to the ultimate ruling on the questions reserved; and under this practice the reservation carried with it authority to make such ultimate disposition of the case as might be made essential by the ruling under the reservation, such as non-suiting the plaintiff where he had obtained a verdict, entering a verdict of judgment for one party where the jury had given a verdict to the other, or making other essential adjustments.
 "Fragmentary references to the origin and basis of the practice indicate that it came to be supported on the theory that it gave better opportunity for considered rulings, made new trials less frequent, and commanded such general approval that parties litigant assented to its application as a matter of course. But whatever may have been its origin or theoretical basis, it undoubtedly was well established when the Seventh Amendment was adopted, and therefore must be regarded as part of the common-law rules to which resort must be had in testing and measuring the right of trial by jury as preserved and protected by the Amendment."
Redman, supra, 295 U.S. at 659-60, 55 S.Ct. at 892-93.
We hold, therefore, that the right of trial by jury is not disturbed where, as here, the issue presented involves a pure question of law, which was addressed at trial and thus preserved for appellate review.
Fourth, if the motion for directed verdict at the close of plaintiff's evidence provides the opposing party and the court with notice of the question of law, renewal of the motion at the close of all evidence is redundant and nonessential. Here, the legal defense of immunity was placed before the opposing party and the court repeatedly throughout these proceedings: Dr. Barnes raised the issue of immunity in his motion to dismiss, answer to the complaint, motion for summary judgment, and motion for directed verdict; Dr. Paul and Harpole raised the issue of immunity in their answer to the complaint, motion for summary judgment, and motion for directed verdict; the court's pre-trial order acknowledged the contentions that the defendants were immune and that Griffin's discharge from Bryce was legally required; and the plaintiff established by his own presentation of evidence that these three state employees were acting within their respective discretionary prerogatives at the time of Griffin's admission and discharge.
Renewal of the directed verdict motion at the close of the evidence gives the court a second opportunity to grant the directed verdict if the evidence is clearly insufficient as a matter of law. Nonetheless, once a question of law is presented by a motion for directed verdict at the close of the plaintiff's evidence, the moving party has fulfilled his obligation to provide notice to the nonmoving party that the legal basis of his case is challenged; and the motion at the close of the plaintiff's evidence provides notice to the court of the challenge to the legal basis of the plaintiff's claim. See 70 Iowa L.Rev., supra, at 279-80. It is not the obligation of the moving party to provide continuous notice of a question of law, once that issue is properly raised and adversely ruled upon by the court.
The authority of an appellate court to direct a judgment contrary to the jury's verdict is grounded in statutory and common law. Code 1975, § 12-22-70, which is a mere codification of the court's inherent power, states that the appellate court may, "upon the reversal of any judgment or decree, remand the same for further proceedings or enter such judgment or decree as the court below should have entered or rendered, when the record enables it to do so." This authority is historically supported. See Henry v. White, 222 Ala. 228, 131 So. 899 (1931); First Nat.Bank of Stevenson v. Crawford, 25 Ala. App. 463, 149 So. 230,cert. den., 227 Ala. 188, 149 So. 228 (1933); Campbell v. Tucker,26 Ala. App. 100, 154 So. 821, cert. den. *Page 779 228 Ala. 658, 154 So. 825 (1934); Wilkes v. Stacy Williams Co.,235 Ala. 343, 179 So. 245 (1938); Drummond v. Franck, 252 Ala. 474,41 So.2d 268 (1949); and Haden v. Lee's Mobile Homes, Inc.,41 Ala. App. 376, 136 So.2d 912 (1961), cert. den., 273 Ala. 708,136 So.2d 920 (1962). Moreover, it is a universally accepted proposition that questions of law are subject to review on appeal by the appropriate appellate court. See Rayburn v. State,366 So.2d 708 (Ala. 1979).
An interpretation of the requirements of Rule 50 and the exercise of an appellate court's discretion to enter judgment contrary to the jury's verdict are set out in Bayamon Thom McAn,Inc. v. Miranda, 409 F.2d 968 (1st Cir. 1969). In Bayamon, the trial court denied the defendants' motion for JNOV on the merits, noting that no motion for directed verdict had been made at the close of all evidence. Observing that rigorous adherence to Rule 50's requirements is sensible and in accord with its objectives, the First Circuit nonetheless rejected a straitjacket approach, which would have precluded appellate review absent a renewed directed verdict motion under the circumstances of that case:
 "This factor alone [the absence of a renewed motion] would be of no avail to appellants had the evidence subsequently presented been previously unrevealed, lengthy, or relevant to the issues raised by the motions for a directed verdict. . . . But [the evidence admitted after the directed verdict motion], occupying only two pages of transcript and involving no more than a few minutes, held no surprises. The evidence, being taken from earlier identified exhibits and a deposition, did not bear on the question of defendants' negligence and contained one item directed at impeaching testimony which had been given by the mother. There is no possibility that any of this could have changed the court's mind in ruling on a repeated motion. The factual and procedural contexts were very similar to those in United States v. 353 Cases, 247 F.2d 473 (8th Cir. 1957), where, with a trial virtually at an end, the court held that rebuttal on subordinate issues after a motion had been made did not have the effect of waiving the legal issue raised by the motion. . . . In the absence of any authority to the contrary, in a case combining the kind of judicial assurance concerning preservation of rights at the time of motion and the brief and inconsequential evidence following the motion, we deem that this is a proper case for the liberal construction commended by Fed.R.Civ.P. 1 in the interests of justice. . . ."
Bayamon, 409 F.2d at 971-72.[4]
It is significant, here, that two of the defendants, Dr. Barnes and Dr. Paul, were called as witnesses for the plaintiff, so that at the close of the plaintiff's evidence nothing remained to be proved with respect to the evidentiary basis of the defendants' immunity defense. The evidence submitted by the defendants after the close of the plaintiff's evidence did not bear on the legal question of immunity. As in Bayamon, there is no reasonable possibility that the evidence submitted by the defendants following the denial of their motion for directed verdict could have changed the trial court's mind in ruling on their repeated immunity defense. Indeed, it is apparent from the record that the plaintiff, in presenting his case-in-chief, assumed the burden of negating the defendants' legal defense of immunity. The evidence of *Page 780 
record bearing on this issue, then, was fully ripened at the close of the plaintiff's evidence when the defendants moved for a directed verdict on the purely legal ground of immunity.
As the United States Court of Appeals for the Eleventh Circuit observed in Rich v. Dollar, 841 F.2d 1558 (11th Cir. 1988): "The entitlement not to stand trial or face the other burdens of litigation provided by the doctrines of absolute immunity and qualified immunity is effectively lost if a case is erroneously allowed to go to trial. Mitchell v. Forsyth, 472 U.S. 511,105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)." Thus, if the motion for a directed verdict was valid, it was incumbent upon the trial judge to grant it, and if he failed to do so, the immunity issue was properly preserved for appellate review.[5]
 II
We now address the issue whether the trial court erred in denying the defendants' motion for a directed verdict based upon the defense of "qualified immunity."
We begin our analysis with a review of the federal court orders applied to the Department of Mental Health and Mental Retardation (the department) at the time of Griffin's admission and discharge.
In 1972, the federal district court set out minimum constitutional standards for adequate treatment of the mentally ill, in Wyatt v. Stickney, 344 F. Supp. 373 (M.D.Ala. 1972). The medical and constitutional minimums set out in Wyatt were assembled from evidence provided by the foremost authorities on mental health in the United States. The district court ordered their implementation, noting that Alabama's treatment program failed to provide 1) a humane psychological and physical environment; 2) qualified staff in numbers sufficient to administer adequate treatment; and 3) individualized treatment plans.
Wyatt's mandate continues in effect and directs the department's implementation of its guidelines in the administration of its facilities. Although the department is no longer under the direct receivership of the district court, it issues quarterly reports to the court to enable the court to monitor its compliance and progress.
The Wyatt requirements apply to the treatment and confinement of patients pursuant to an involuntary commitment procedure. The minimum standards for a humane psychological and physical environment include the patient's right to the least restrictive conditions necessary to achieve the purposes of confinement; the patient's unrestricted right to send sealed mail; the patient's right to be free from unnecessary or excessive medication; and the patient's right to be free from physical restraint and isolation. The minimum standards for an individualized treatment plan include a statement of the specific problems and needs of the patient; a statement of the least restrictive treatment conditions necessary to achieve the purposes of confinement; a description of intermediate and long-range treatment goals; specification of staff responsibility in order to attain the treatment goals; criteria for discharge; and an individualized post-hospitalization plan.
The minimum standards conclude:
 "If the patient no longer requires hospitalization in accordance with the standards for commitment, or if a treatment plan has not been implemented, he must be released immediately unless he agrees to continue with treatment on a voluntary basis." *Page 781 
Wyatt, 344 F. Supp. at 386. The State was enjoined from failing to fully implement each of the minimum standards as set out in the federal order.
In 1974, a three-judge panel for the federal district court set out standards and safeguards required by due process for the protection of persons whose liberty was placed in jeopardy as a consequence of their becoming the subjects of involuntary commitment proceedings. In Lynch v. Baxley, 386 F. Supp. 378
(M.D.Ala. 1974), the panel established the requisite findings necessary to support an order of involuntary commitment: (1) that the person to be committed is mentally ill; (2) that the person to be committed poses a real and present threat of substantial harm to himself or others; (3) that the danger posed by the person to be committed has been evidenced by a recent overt act; and (4) that there is treatment available for the illness diagnosed.
Lynch states in regard to dangerous behavior:
 "Due process requires that the need for confinement be based upon a substantial likelihood that dangerous behavior will be engaged in unless restraints are applied. While the actual assessment of the likelihood of danger calls for an exercise of medical judgment, the sufficiency of the evidence to support such a determination is fundamentally a legal question. A mere expectancy that danger-producing behavior might be engaged in does not rise to the level of legal significance when the consequence of such an evaluation is involuntary confinement. To confine a citizen against his will because he is likely to be dangerous in the future, it must be shown that he has actually been dangerous in the recent past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or another."
Lynch, 386 F. Supp. at 391. (Citations omitted.) The panel observed that due process demands that an individual be subjected to forced confinement only if the necessity for confinement is proved by evidence "having the highest degree of certitude reasonably attainable in view of the nature of the matter at issue." Lynch, 386 F. Supp. at 393. Wyatt and Lynch apply to Bryce Hospital.[6]
Generally, the State of Alabama, and its officers and agents, cannot be made defendants in any court. See Ala. Const., art. I, § 14; and Hickman v. Dothan City Bd. of Educ., 421 So.2d 1257
(Ala. 1982). Our cases adhere to the view that the State has an interest "such as will prohibit suit against the State official or employee where the action is in effect against the State."DeStafney v. University of Alabama, 413 So.2d 391 (Ala. 1982).
In the instant case, then, the dispositive issue is twofold: Is the lawsuit against the defendants, in effect, a suit against the State? And, under the allegations of tortious injury, are the defendants entitled to substantive immunity because they were engaged in the exercise of a discretionary public function at the time of Douglas Griffin's admission and discharge?
As early as 1907, this Court addressed the issue of employee immunity and concluded that a state official may not escape individual liability for his tort by "arguing that his mere status as a state official cloaks him with the state's constitutional immunity." Tort Liability of State Officials inAlabama, 35 Ala.L.Rev. 153 (1984).
 "It must stand to reason that no person can commit a wrong upon the property or person of another, and escape liability, upon the theory that he was acting for and in the name of the government which is immune from suit at the instance of one of her subjects."
Elmore v. Fields, 153 Ala. 345, 350, 45 So. 66, 67 (1907). And, in 1961, that principle of Elmore was restated in St. ClairCounty v. Town of Riverside, 272 Ala. 294, 128 So.2d 333 (1961): *Page 782 
 "`Nor does the immunity of the state from suit relieve an officer of the state from responsibility when he acts tortiously on the rights of an individual. . . . An officer who acts illegally is not acting as an officer, but stands in the same light as any other trespasser.'"
272 Ala. at 296, 128 So.2d at 334, quoting 49 Am.Jur. States,Territories, and Dependencies at 308-10. Thus, Elmore and St.Clair County defined the tort liability rule in Alabama with respect to public officials and employees; in fact, no Alabama case has held that a state employee may never be sued for simple negligence committed within the general scope of his employment.DeStafney, 413 So.2d at 392.[7]
The tort liability rule as proposed by the Restatement (Second)of Torts, § 895D, Public Officers (1974), preceded the development of our own recent case law:
 "(1) Except as provided in this Section a public officer is not immune from tort liability.
 "(2) A public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function.
 "(3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if
 "(a) he is immune because engaged in the exercise of a discretionary function,
 "(b) he is privileged and does not exceed or abuse the privilege, or
 "(c) his conduct was not tortious because he was not negligent in the performance of his responsibility."
In 1977, this Court observed that a suit may, under limited circumstances, be maintained against a state official in hisrepresentative capacity:
 "While the State itself may not be made a party to such action, is does not necessarily follow that its officers, Ray Bass, Claude Kelley and Governor Wallace, in their respective capacities, are also immune. The essence of plaintiffs' complaint is that these officers of the State acted fraudulently, in bad faith, beyond their authority, or acted under a mistaken interpretation of the law. Such allegations bring this case within those not protected by Section 14 of the Constitution." (Emphasis added.)
Unzicker v. State, 346 So.2d 931, 933 (Ala. 1977). In Gill v.Sewell, 356 So.2d 1196 (Ala. 1978), a police officer was injured by a work release inmate. The officer sued the work release center, the center director, the Board of Corrections, the board's commissioner (individually and in his official capacity), and the State, alleging that the defendants were negligent in allowing a convicted felon with a long history of violent crimes to be released to a minimum security institution. The Gill Court held the suit barred against the state, its agencies, and its officials in their official capacities, by § 14, because the police officer's suit did not come within the categories recognized in Aland v. Graham, 287 Ala. 226, 250 So.2d 677 (1977) (see note 7), and Unzicker, supra. As to the commissioner of the board of corrections, sued in his individual capacity, the Court concluded:
 "Section 14 does not necessarily immunize State officers and agents from individual civil liability. [Citations omitted.]
 "There is no allegation in the complaint that J.C. Locke exceeded the authority given him by statute. The complaint at best alleges that he negligently performed his statutory duty. [Citation omitted.] Acting pursuant to such statutory authority, J.C. Locke acted as the State and the claim is barred by Section 14 of the Constitution."
Gill, 356 So.2d at 1198.
Milton v. Espey, 356 So.2d 1201 (Ala. 1978), released the same date as Gill, upheld *Page 783 
the dismissal of these claims based upon the state employee's exercise of discretionary functions (breach of contract and negligent supervision), but remanded the case for further proceedings with respect to the tort claim of fraud:
 "In determining whether an action against a State officer or agent is in fact a suit against the State, the court considers the nature of the suit or the relief demanded. [Citations omitted.]
". . . .
 "The claim asserted in Count Three is fraud, allegedly committed by Espey while acting outside his authority and contrary to the rules and regulations of the University of Alabama. The rules and regulations of the University are not part of the record. What powers and duties Espey has as Director of the Ferguson Center we cannot guess. However, from the record we cannot say that Milton has not raised a material issue of fact or that Espey is entitled to judgment in his favor as a matter of law." (Emphasis added.)
Milton, 356 So.2d at 1202-03.
In DeStafney v. University of Alabama, supra, we adopted the tort concept of the Restatement in addressing the extent of immunity from tort liability applicable to state officials.DeStafney posed two questions that now form the dispositive issue in the instant case: Was the lawsuit against the defendants, in effect, a suit against the State? And, under the allegations of tortious injury, were the defendants entitled to substantive
immunity because they were engaged in the exercise of a discretionary public function?
In addressing the first question, the DeStafney Court preserved the state's constitutional immunity and protection applicable to defendants sued in their representative capacities, but found the claim for personal injury under its facts not constitutionally barred:
 "Clearly, under the guidelines of Gill and Milton, a claim for personal injury based upon the alleged negligent conduct of a State employee, even when committed in the line and scope of employment, is not within the ambit of § 14's protection. Such a claim, by virtue of its nature and the relief demanded, in no way seeks to circumvent the prohibition of § 14. Any state interest affected by the suit is far too incidental to supply the requisite nexus for extension of constitutional immunity to the individual employee defendant. This suit, and the legal effects incident thereto, are strictly between the named parties plaintiff and the individual defendant. In no sense can it be said that Gabrielle Martinez is a mere nominal party defendant."
DeStafney, 413 So.2d at 395.
In addressing the second question, the Court found that, although not protected by the state's constitutional immunity, a defendant may still be entitled to substantive immunity:
 "This is not to say, however, that every act or performance of duty by a state official or employee, by virtue of its characterization as negligence, necessarily falls outside the immunity doctrine. Even absent the requisite identity between the State and the state official or employee defendant to invoke absolute immunity, the Restatement's doctrine of substantive immunity may yet be invoked if the official or employee 1) is engaged in the exercise of a discretionary function; 2) is privileged and does not exceed or abuse the privilege; or 3) is not negligent in the performance of his responsibility." (Emphasis added.)
DeStafney, 413 So.2d at 395.
The DeStafney discretionary function test was applied in Bellv. Chisom, 421 So.2d 1239 (Ala. 1982):
 "As the Restatement's comments suggest, the courts have at times found the discretionary function standard difficult to interpret. Nevertheless, in many cases this standard's proper application will be readily apparent. Two such cases will serve to illustrate the conflicting policy considerations the courts must apply. On the one hand, in DeStafney
itself we had no difficulty in rejecting the immunity claim of the individual defendant, an aide at the University day care center *Page 784 
who allegedly allowed the plaintiff's child to fall off playground equipment. This defendant's function clearly required due care rather than difficult decision making. On the other hand, we accepted the claim of immunity in Gill v. Sewell, 356 So.2d 1196
(Ala. 1978), where the director of a work release center was sued for his decision to release a convicted felon who shot the plaintiff. That decision was an exercise of discretion central to the defendant's function, and accordingly in DeStafney we noted, `unquestionably, Gill falls squarely with § 895D (3)(a) of the Restatement,'
413 So.2d at 394."
Bell, 421 So.2d at 1241.[8]
The Restatement's comment f to § 895D suggests the following factors to be considered in determining what is a discretionary function: The nature and importance of the function that the officer is performing; the extent to which passing judgment on the exercise of discretion will amount necessarily to passing judgment on the conduct of a coordinate branch of government; the extent to which the imposition of liability would impair the free exercise of discretion by the officer; the extent to which the ultimate financial responsibility will fall on the officer; the likelihood that harm will result to members of the public if the action is taken; the nature and seriousness of the type of harm that may be produced; and the availability to the injured party of other remedies and other forms of relief.
We now apply these principles of law to the facts before us. First, we hold that the lawsuit against the defendants is not, in effect, a lawsuit against the State. Section 14 prevents a suit against state officers and employees in their official capacity when a result favorable to the plaintiff would directly affect a contract or property right of the State. Milton, 356 So.2d at 1202. This doctrine is not an issue in the instant case. However, Dale's claim for wrongful death based upon the alleged negligent and wanton conduct of the defendants is not within the scope of § 14's constitutional protection. Under the law as set forth inGill, Milton, and DeStafney, Dale's claim in no way seeks to circumvent the prohibition of § 14, and any state interest affected by his lawsuit is "too incidental to supply the requisite nexus for extension of constitutional immunity" to the defendants. DeStafney, 413 So.2d at 395. In sum, the defendants are not "conduits" through which Dale sought to recover damages from the State, or through which the State sought to engage in a governmental function with respect to Dale.
Second, we hold that, under the allegations of tortious injury, the defendants are entitled to substantive immunity as a matter of law, because they were engaged in the exercise of a discretionary public function at the time of Griffin's admission and discharge. The facts of this case fall squarely within § 895D (3)(a) of the Restatement, as adopted in DeStafney. The function that these defendants and those in similar positions perform in the mental health facilities of this state is of urgent importance to those civilly committed, the families of those committed, and the citizens of Alabama. Alcoholism and substance abuse are enigmas that frustrate the lofty aims of life itself and which only qualified professionals, such as the defendants, are equipped to solve.
Moreover, in Alabama, the official functions of these state employees are complicated by the dual duty they owe to the public and to the individual patient. The defendants owe a duty to the general public not to release a civilly committed patient until his treatment has been completed and he is no longer a threat to public safety and order. The defendants have a continuing *Page 785 
duty to perform the functions of the Bryce Substance Abuse Unit in a manner designed to admit, treat, and discharge patients without disrupting the order of a free society. However, the defendants, have a concomitant duty to the patient, as demonstrated by the minimum constitutional guidelines of Wyatt
and Lynch. The defendants must provide their patient a treatment program that achieves the purposes of confinement under the least restrictive conditions. They must provide him with intermediate and long-range treatment goals; and, if he fulfills those goals or no longer requires hospitalization in accordance with the standards for commitment, they must release him. Failure to do so exposes the defendants to liability for violating the patient's right to due process of law.
Griffin's release from the unit after the threats made in the April 22 letter illustrates the depth of the defendants' discretionary public function. Called upon to make a determination of Griffin's dangerousness and tendencies toward violence, the defendants relied upon the advice and observations of two staff psychiatrists, Griffin's response to the treatment plan, his willingness to continue the objectives of the treatment plan after release, and their best judgment that Griffin had received the maximum benefits of his hospitalization. At the point of determination, the defendants faced a decision whether to confine Griffin involuntarily, based upon a substantial likelihood that he would engage in dangerous behavior upon release, or release Griffin under the terms of the treatment plan, which he had completed as a prerequisite for his release. Thus, the defendants faced the concomitant duties not to violate Griffin's right to due process of law by involuntary confinement and not to release Griffin into society before satisfaction of the conditions set at the time of commitment.[9]
Based upon the foregoing considerations, we hold that the defendants are entitled to the umbrella of substantive, or qualified, immunity from civil liability. Therefore, we reverse the judgment and render judgment for defendants Barnes, Paul, and Harpole.
REVERSED AND JUDGMENT RENDERED.
TORBERT, C.J., and MADDOX, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
[1] Griffin v. State, 500 So.2d 83 (Ala.Cr.App. 1986).
[2] James Harpole attended the Candler School of Theology at Emory University; he received clinical training at Grady Hospital in Atlanta and at the Georgian Clinic, a clinic for alcoholics. He has been employed at Bryce Hospital for 20 years, and, in April 1982, was coordinator of the Substance Abuse Unit, a position he has held since 1969. Harpole oversees the ongoing operation of the unit, including overseeing the unit's day-to-day operations, coordinating the unit's services, evaluating the unit's compliance with hospital and mental health policies, and the providing of direct treatment services.
Dr. Waters Paul is a licensed clinical psychologist employed by the Bryce unit for 20 years. His duties include performance of initial treatment assessments on new patients, development of initial and master treatment plans, evaluation of treatment progress, performance of special psychological evaluations, and the administration of treatment in particular instances.
Dr. Radford Barnes is a medical doctor employed at Bryce since September 1979. He was assigned to the substance abuse unit from the hospital's geriatric ward and at the time of the events in this case he served on the unit as a medical doctor and administrator with authority to sign admission and discharge papers.
[3] The U.S. Supreme Court has found the seventh amendment not to be a fundamental aspect of due process or the liberty protected by the due process clause of the fourteenth amendment; therefore, it is not applicable to state court proceedings. Minneapolis St. L.R. Co. v. Bombolis, 241 U.S. 211, 36 S.Ct. 595,60 L.Ed. 961 (1916); and E. Nowak, D. Rotunda, J. Young, ConstitutionalLaw (3d ed. 1986). The seventh amendment, however, is not materially different from Article 1, Section 11, of the Alabama Constitution, as each holds the right to a jury inviolate and preserves such right as it was at common law at the time the amendment or section was adopted. Poston v. Gaddis,335 So.2d 165 (Ala.Civ.App.), cert. den., 335 So.2d 169 (Ala. 1976); and Ala. Const. Article 1, § 11. See Slocum v. New York LifeInsurance Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879 (1913).
[4] The issue of survival of a question of law under Rule 50 (b) has been addressed in somewhat different form in HowardUniversity v. Cassell, 126 F.2d 6 (D.C. Cir. 1941), cert. den.,Cassell v. Howard University, 316 U.S. 675, 62 S.Ct. 1046,86 L.Ed. 1749 (1942), reh. den., 316 U.S. 711, 62 S.Ct. 1274,86 L.Ed. 1777 (1942). The defendant moved for a directed verdict on the ground of the statute of limitations at the close of plaintiff's evidence and again at the close of all evidence. The court denied the motion. After the verdict, the defendant moved for new trial but did not move to have the verdict set aside and judgment entered in accordance with its motion for directed verdict. The motion for new trial was denied. On appeal, the plaintiff claimed the defendant could not urge the statute of limitations defense because of its failure to comply with Rule 50 (b) by moving for JNOV. The appellate court rejected this contention on the ground that the defendant's failure to move for JNOV under Rule 50 (b) did not constitute a waiver of the statute of limitations defense. 69 A.L.R.2d 496.
[5] We are not to be understood as effecting a change in Rule 50's requirement that the motion for directed verdict be made at the close of the evidence to preserve the right to move for JNOV on the "insufficiency of the evidence" ground; nor do we adopt the doctrine of basic and fundamental error as a basis for appeal without preserving the issue at trial. "[A]ppellate court recognition of alleged errors not called to the trial court's attention has a deleterious effect on the trial and appellate process. Also, despite its repeated articulation, the theory has never developed into a principled test, but has remained essentially a vehicle for reversal when the predilections of a majority of an appellate court are offended." Dilliplaine v.Lehigh Valley Trust Co., 457 Pa. 255, 322 A.2d 114 (1974).
[6] Lynch v. Baxley, 386 F. Supp. 378 (M.D.Ala. 1974), rev'd on other grounds, 651 F.2d 387 (5th Cir. 1981), is codified as to its requirements for civil commitment at Ala. Code 1975, §22-52-10.
[7] In Finnell v. Pitts, 222 Ala. 290, 293, 132 So. 2, 4 (1930), this Court stated, "When a person commits a tort, it is wholly immaterial upon the question of his liability, whether he was acting officially or personally." We are, however, to be understood as addressing only the tort exceptions to § 14's prohibitions. We leave unaddressed and unchanged the nontort exceptions to § 14 set out in Aland v. Graham, 287 Ala. 226,250 So.2d 677 (1971), and the general prohibition barring suits against state officials in their representative capacities.
[8] The Bell majority concluded that discretionary function immunity is "called for when necessary to preserve the decision making function of government." Bell, 421 So.2d at 1241. "The problem is not to define terms like `discretionary' or `planning,' but to make a pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function to be effectively performed. Thus, courts must determine not only the existence but the extent of an `immunity,' which may be absolute but is more commonly limited to good faith actions." Bell, at 1241. See, also, Deal v. TannehillFurnace Foundry Com'n, 443 So.2d 1213 (Ala. 1983).
[9] See, also, Donahoo v. State, 479 So.2d 1188 (Ala. 1985), andHill v. Allen, 495 So.2d 32 (Ala. 1986), for further treatment of the issue of immunity. Donahoo held that state officials responsible for release and supervision of prisoners were not entitled to absolute immunity where the complaint alleged that the officials had acted fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of law, but that, absent an allegation that the officials knew the prisoners posed a threat to the murder victim in particular, the officials could not be found to have breached a specific duty and could not be liable for civil damages arising from the murder. For an excellent discussion of the doctrine of substantive immunity in the context of a claim under 42 U.S.C. § 1983, see Rich v.Dollar, supra.