Paul J. Cranman, as executor of the estate of Matthew Cranman, deceased, appeals from a summary judgment entered by the Tuscaloosa County Circuit Court, on the basis of discretionary function immunity, in favor of Dr. David Maxwell; Dr. Patricia A. Hubbs; Dr. John Galaznik; and Dr. Joe Bethany (hereinafter "the state physicians"). We affirm.
In September 1996, Matthew Cranman, a former University of Alabama student, brought a civil action against Maxwell; Hubbs; Galaznik; the Russell Student Health Center of the University of Alabama (hereinafter "the student health center"); Druid City Hospital Regional Medical Center; Dr. Perry L. Lovely; and Dr. R. Mark Kendrick. With respect to Maxwell, Hubbs, and Galaznik, Matthew alleged that these physicians had negligently and wantonly breached the applicable standard of care in treating him, and that they thereby had breached an implied contract to render medical treatment. Maxwell, Hubbs, and Galaznik filed an answer asserting, among other things, that they were immune from liability because, they claimed, they were engaged in a discretionary function within the scope of their authority as employees of the University of Alabama. Matthew moved to strike this defense, whereupon Maxwell, Hubbs, and Galaznik filed a motion for a summary judgment, supported by their affidavits and their responses to interrogatories. Matthew then amended his complaint to add Bethany as a defendant with respect to his claims against Maxwell, Hubbs, and Galaznik, and dropped the student health center as a party; he also filed responsive briefs addressing the summary judgment motion filed by Maxwell, Hubbs, and Galaznik.[1]
The trial court entered a summary judgment in favor of the state physicians, concluding that they were protected from liability *Page 388 
by discretionary function immunity. Matthew died in November 1997; his executor, Paul Cranman, was substituted as a plaintiff, pursuant to Rule 25, Ala.R.Civ.P. The executor appealed the judgment to the Alabama Supreme Court. The Supreme Court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975. This court remanded the cause for the trial court to enter an order in compliance with Brown v. Whitaker Contracting Corp., 681 So.2d 226 (Ala.Civ.App. 1996), and the trial court entered a final judgment in favor of each of the state physicians in compliance with Brown. The executor's claims against DCH remain pending in the trial court, and all claims against Kendrick have been dismissed with prejudice.
In reviewing the disposition of a motion for summary judgment, we utilize the same standard as the trial court in determining "whether the evidence before [it] made out a genuine issue of material fact" and whether the movant was "entitled to a judgment as a matter of law." Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412
(Ala. 1990).
The record reveals the following facts. Matthew, while a student at the University of Alabama, went to the student health center on September 12, 1994, complaining of swelling and pressure in the area of his left testis that possibly was caused by a hernia. Dr. Maxwell examined him and diagnosed epididymitis, an inflammation of the sperm-collecting tubes near the testes; Dr. Maxwell prescribed antibiotic medication and a Sitz bath and instructed him to return in three to four days if he did not improve.
Matthew returned to the student health center on October 11, 1994, complaining of having had low back pain for the previous week. At that time, he was examined by Dr. Galaznik. Matthew described no specific injury, nor symptoms radiating to his legs; Dr. Galaznik noted that his back was straight, that his deep tendon reflexes were satisfactory, and that a straight-leg-raising test was negative. Dr. Galaznik assessed the condition as muscle pain, and prescribed medication accordingly.
On November 7, 1994, Matthew again went to the student health center, reporting that he had a possible prostate infection. Dr. Maxwell examined Matthew and determined that he had a slight tender mass effect in the left epididymis; however, a testicular exam was negative. Dr. Maxwell again prescribed antibiotics, and instructed Matthew to return in two weeks for a recheck.
Matthew returned to the student health center on November 29, reporting mild discomfort in his left testicle. He was examined by Dr. Bethany, who noted a slight enlargement in the testicle, which indicated a possible accumulation of fluid (hydrocele); a two-glass urine specimen was negative. Dr. Bethany took Matthew off the previously prescribed antibiotics, prescribing an analgesic instead, and recommended that he consult a urologist in *Page 389 
his hometown of Savannah, Georgia, during his academic break.
Matthew next visited the student health center on August 23, 1995; this time he complained of having had a stabbing, burning pain in his left flank for four days after having slept in a soft, uncomfortable bed at home. Dr. Maxwell examined him and determined that he had some left paralumbar pain, although he was without problems in flexion and twisting; Dr. Maxwell prescribed medication and physical therapy.
Two days later, Matthew reported for physical therapy at the student health center and later that day he was examined by Dr. Hubbs. He related his back pain symptoms, and Dr. Hubbs noted that he was tender along the costal margin, in his left side, and in his flank. A urinalysis was negative. Dr. Hubbs's impression was that Matthew had suffered a strain of the chest muscles; she prescribed additional medication, and instructed him to try heat or ice and to return in a week for a recheck. When he returned six days later, he reported that he was doing better, and Dr. Hubbs assessed his chest wall pain and gave him further medication.
Matthew returned to the student health center on October 11, 1995, reporting that he had been "working out," that his low-to mid-back had been bothering him for one to two weeks, and that his epididymitis had flared up. Dr. Hubbs noted that Matthew had had symptoms of a hydrocele and had seen a urologist; she examined him and found that he was tender in the lower parathoracic and lumbar muscles and in his epididymis. Dr. Hubbs's impression was that he had suffered a recurrence of his epididymitis and a back strain; she prescribed pain and antibiotic medication and back exercises and told him to return in two weeks if he did not improve.
On November 9, 1995, Matthew visited the student health center complaining of nausea, vomiting, and diarrhea, after having eaten chicken at a fraternity house. He was examined by Dr. Maxwell, but he reported no back pain or testicular discomfort at this time.
On November 17, 1995, Matthew returned to the student health center, describing recurring back pain and stating that he had not slept for a week. Dr. Hubbs noted that he had reported that he had been under stress, and that he was now experiencing shoulder pain and tightness, which was different from his earlier back pain. Dr. Hubbs found that Matthew was tight and tender in his trapezius, paracervical, and rhomboid muscles; she diagnosed upper-back and neck strain, prescribed heat and medication, and referred him to physical therapy.
In December 1995, Matthew was diagnosed with testicular cancer, and cancerous cells were found in his lungs and behind his kidneys. His left testicle was surgically removed, and he underwent chemotherapy, radiation, and other cancer treatments.[2]
It is undisputed that at all times, the state physicians acted within their capacities as physicians employed by the University of Alabama as student health service providers.
Under Alabama law, a public officer acting within the general scope of his or her authority is not subject to tort liability for an administrative act or omission if he or she "is immune because engaged in the exercise of a discretionary *Page 390 
function." Taylor v. Shoemaker, 605 So.2d 828, 831 (Ala. 1992) (quoting Restatement (Second) of Torts § 895D (1979)). As our Supreme Court noted in Grant v. Davis, 537 So.2d 7, 8 (Ala. 1988), "Discretionary function immunity is just what its label implies: immunity from tort liability afforded to public officials acting within the general scope of their authority in performing functions that involve a degree of discretion" (emphasis added). Moreover, "[t]he applicability of the doctrine of qualified immunity must be determined on a case-by-case basis," and "whether a particular defendant is engaged in a protected discretionary function, and is thereby immune from liability for injuries he causes, is a question of law to be decided by the trial court." Id.
To date, our Supreme Court has applied the doctrine of discretionary immunity in each case involving state-employed physicians in which the doctrine has been raised. For example, in Barnes v. Dale, 530 So.2d 770
(Ala. 1988), our Supreme Court held that a medical doctor who served on a psychiatric patient's treatment team at Bryce Hospital, a state facility, was entitled to discretionary function immunity with respect to his decision to release the patient from confinement. The Barnes court reversed a judgment based upon a jury verdict in favor of the administrator of a person killed by the patient after his release.
Similarly, in Smith v. Arnold, 564 So.2d 873 (Ala. 1990) ("Smith I"), our Supreme Court held that a doctor serving as a state-employed psychiatrist at a minimum-security mental health center was entitled to discretionary function immunity with respect to his allegedly negligent failure to diagnose the suicidal tendencies of a patient who later committed suicide while in confinement. Notably, the Smith I court so held after noting that the physician's decisions and recommendations "involved the exercise of his professional judgment and discretion" (emphasis added), and that "[e]xposure to liability for such decisions, which are made on the state's behalf, would unduly hamper the decision-making process and impose undesirable shackles on the agencies of government." 564 So.2d at 876. Our Supreme Court would later summarize the holding in Smith I as follows:
 "In Smith [I] we held that a state employee doctor in [the mental health] profession performs a discretionary function in diagnosing and treating a patient and is therefore entitled to immunity in an action alleging that the employee doctor negligently diagnosed and treated a patient . . . and failed to provide adequate suicide prevention measures for that patient."
Nance v. Matthews, 622 So.2d 297, 300-01 (Ala. 1993); see also Smith v. King, 615 So.2d 69 (Ala. 1993) ("Smith II") (affirming a summary judgment as to claims against nonphysician mental health professionals arising out of same facts as Smith I).
Also instructive is Lennon v. Peterson, 624 So.2d 171 (Ala. 1993), in which a state-employed athletic trainer allegedly misdiagnosed a case of avascular necrosis in an athlete's hip and groin area as a "groin strain" and applied ice and electricity rather than recommending surgery. In affirming a summary judgment in favor of the trainer on the basis of discretionary function immunity, our Supreme Court stated the following pertinent factors underlying its decision:
 "[The trainer]'s job required that she use her discretion and judgment. As an athletic trainer, she had the responsibility to determine whether an athlete was faking or hiding an injury. She had to ascertain the source of the injury, the extent of the injury, and the treatment *Page 391 
for the injury. She had to calculate whether the injury was adequately responding to treatment. She had the further responsibility of determining when an athlete should be restricted from play, referred to a doctor, or allowed to return to the field. Because all of these functions required the use of her judgment and discretion, she is entitled to discretionary function immunity."
624 So.2d at 175 (emphasis added).
In granting the state physicians' summary judgment motion, the trial court relied upon Smith I and Smith II, as well as Harper v. Gremmel,703 So.2d 346 (Ala. 1997), an affirmance without opinion.[3] In Harper, a state-employed defendant physician affiliated with a private hospital was sued after one of his patients, who was suffering from seizures and alcohol withdrawal, leapt or fell from a hospital window. The physician contended that he was entitled to qualified immunity, citing Smith I. The trial court agreed, and our Supreme Court affirmed the trial court's summary judgment, without writing an opinion. In his dissenting opinion, Justice Cook opined that while applying the discretionary function immunity defense to treatment in private institutions creates inconsistent results, "there may be valid reasons for recognizing a qualified immunity defense, as we have done, for physicians practicing in state institutions." 703 So.2d at 348 (emphasis in original).
As Matthew did in the trial court, the executor principally argues on appeal that precedents from other states rejecting immunity for state-employed physicians are persuasive and should be followed by Alabama courts. The trial court, while stating that "[Matthew] made a very compelling argument that [the state physicians] should not be entitled to discretionary function immunity because the character of the discretion which they exercised was medical and not governmental," concluded that "under the current law of the State of Alabama a State-employed physician is entitled to immunity whether he's exercising `medical discretion' or `governmental discretion.'" We agree with the trial court that no Alabama opinion has made any distinction, for purposes of tort liability, among the various forms of discretion that may be afforded to public servants in this state. Indeed, Kassen v. Hatley,887 S.W.2d 4 (Tex. 1994), one of the authorities upon which the executor principally relies, describes Alabama as a state in which government medical personnel are immune from tort liability arising from the exercise of discretion in both governmental and medical decisions. 887 S.W.2d at 11 (citing Smith I).
Assuming, without deciding, that Smith I, Smith II, and Harper (or Barnes and Lennon) may have been wrongly decided, we are bound by those decisions of our Supreme Court. We are not at liberty to depart from the decisions of our Supreme Court that have held state-employed physicians to be immune from liability for their discretionary functions, whether that discretion is labeled "governmental" or "medical" in nature. Because the decisions of our Supreme Court "govern the holdings and decisions of the courts of appeals," § 12-3-16, Ala. Code 1975, it is for that court, and not this court, to draw such a distinction in the first instance.
In this case, the state physicians were employed to provide health care to the student population at a state university. Their diagnoses of Matthew's condition *Page 392 
and their recommendations as to treatment of that condition called for no less "professional judgment and discretion" than those made by the state-employed physicians in Barnes, Smith I, and Harper, or the state-employed trainer in Lennon, and it follows that they are entitled to the same discretionary function immunity that was afforded to the defendants in those cases. Thus, the trial court correctly entered the summary judgment in favor of the state physicians, and we affirm that judgment.
AFFIRMED.
Yates, Monroe, Crawley, and Thompson, JJ., concur.
[1] Dr. Bethany moved to dismiss, asserting that he was not timely added as a defendant. His motion was never ruled upon by the trial court, and the state physicians do not assert this ground as a basis for affirmance as to Dr. Bethany.
[2] The record does not indicate whether Matthew's death, in November 1997, was caused by cancer.
[3] While "unpublished" orders or judgments of the supreme court "have no precedential value" under Rule 53(d), Ala.R.App.P., Harper was published by the reporter of decisions pursuant to Rule 53(c), Ala.R.App.P., because Justice Cook dissented from the affirmance.