United States Court of Appeals,

Eleventh Circuit.

No. 95-6123.

Walter McMILLIAN, Plaintiff-Appellee,

v.

W.E. JOHNSON, Tommy Herring, Tom Allen, in their individual capacities, et al., Defendants,

Thomas Tate, Simon Benson, Larry Ikner, in their individual capacities, Defendants-Appellants,

Association of County Commissions of Alabama Liability Self Insurance Fund, Intervenor-Defendant.

July 9, 1996.

Appeals from the United States District Court for the Middle District of Alabama. (No. CV-93-A-699-N), W. Harold Albritton, III, Judge.

Before COX and BARKETT, Circuit Judges, and PROPST[*], District Judge.

COX, Circuit Judge:

Walter McMillian was convicted of the murder of Ronda Morrison and sentenced to death. He spent nearly six years on Alabama's death row, including over a year before his trial. The Alabama Court of Criminal Appeals ultimately overturned McMillian's conviction because of the state's failure to disclose exculpatory and impeachment evidence to the defense. After the state dismissed the charges against McMillian, he brought this § 1983 action against various officials involved in his arrest, incarceration, and conviction. In essence, McMillian alleges that state and local officials prosecuted and punished him for a crime that they knew he

_____

[*]Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

did not commit.

This is an appeal from the district court's order denying several defendants' motions for summary judgment based on qualified immunity. Thus, at this stage of the litigation, we do not know to what extent McMillian's allegations of egregious official misconduct are true. Our role on this appeal is to decide the legal question of whether, if McMillian's allegations are true, the officials responsible are entitled to qualified immunity.

## I. FACTS

To put McMillian's claims in context, we describe in some detail the events leading up to his arrest, pretrial detention on death row, trial, and conviction. Many of the facts surrounding these events are hotly disputed at this, the summary judgment stage of the litigation.

Ronda Morrison was murdered in Jackson Cleaners in Monroeville, Alabama. Thomas Tate, the Sheriff of Monroe County, Larry Ikner, an investigator for the Monroe County district attorney, and Simon Benson, an Alabama Bureau of Investigation agent, were involved in the investigation of the Morrison murder. Tate, Ikner, and Benson are the appellants on this appeal.

On June 3, 1987, Tate, Ikner, and Benson interviewed Ralph Myers, who had been arrested for the murder of a Vicky Pittman. Myers admitted to being involved in the Pittman murder and claimed that McMillian also was involved. Myers also was questioned about the Morrison murder but denied any involvement in or knowledge of the Morrison murder. He claimed that he did not shoot Morrison, that McMillian did not give him a gun or tell him to shoot

Morrison, and that he did not know who killed Morrison. Also during this interview, Myers insisted on having McMillian charged with sodomy, accusing McMillian of raping him several months earlier in Conecuh County. There is evidence that Tate, Ikner, and Benson coerced Myers into falsely accusing McMillian of sodomy so that they could obtain custody of McMillian while constructing evidence inculpating McMillian in the Morrison murder. A warrant was issued for McMillian's arrest on sodomy charges.

The next day, Tate, Ikner, and Benson were called to the Conecuh County Jail at the request of a Bill Hooks. On the night of the Morrison murder, almost seven months earlier, Hooks had given a statement in which he claimed to have seen a white male with a scar on his face and a black male whom he knew as "John Dozier" leaving Jackson Cleaners in a greenish-blue pickup truck around the time of the murder. No action was taken at the time, however, because the officers did not know a "John Dozier." When interviewed by Tate, Ikner, and Benson, Hooks said that he had seen a photograph of Myers in the newspaper and he identified Myers as the white male whom he had seen at Jackson Cleaners on the day of the Morrison murder.

McMillian was arrested several days later on a highway near his home for sodomy. He was taken to the Monroe County jail to be held until he was transported to Conecuh County. Later that day, Benson learned that Karen Kelly, a girlfriend of McMillian, wanted to speak to him at the Escambia County Jail. Tate and Ikner went with Benson to interview Kelly. She told them that on the day after Morrison's murder, McMillian confessed to her that he had

killed the girl at Jackson Cleaners in Monroeville.  Three days later Kelly signed a sworn statement relating what she had told Tate, Ikner, and Benson.

Based on the statements of Hooks and Kelly, capital murder warrants were issued against McMillian and Myers for the Morrison murder.  McMillian then was transferred to Escambia County and charged with the unrelated murder of Pittman.  Myers already had been charged in the Pittman murder.

The next day, Tate, Ikner, and Benson interviewed Myers again. Myers stated that he met McMillian on the morning of Morrison's murder, drove McMillian to Jackson Cleaners in McMillian's truck, and waited outside while McMillian went into the cleaners.  He claimed that, three days later, McMillian told him that he had killed someone when he was at Jackson Cleaners.  On several subsequent occasions, Myers gave statements revealing further details about what he claimed happened on the day of the Morrison murder.  McMillian alleges that all of these statements by Myers were false and coerced by Tate, Ikner, and Benson.

McMillian and Myers both were moved to the Conecuh County Jail for a preliminary hearing on the sodomy charge against McMillian. The hearing was continued.  McMillian was transferred to the Monroe County Jail, while Myers remained at the Conecuh County Jail. During the night, two armed men broke into the Conecuh County Jail and threatened Myers.  Ikner, Benson, and an FBI agent investigated the incident.  Ikner gave an oral report to the Monroe County district attorney the next day.  The district attorney filed motions to place McMillian and Myers in the custody of the Alabama

Department of Corrections to ensure their safety.  A Monroe County Circuit Judge granted the motions.

The Department of Corrections (the "DOC") incarcerated McMillian and Myers on death row at the Holman Correctional Facility.  McMillian alleges that Tate, Ikner, Benson, and DOC officials conspired to place him on death row not to ensure his safety but to punish and intimidate him.  McMillian remained on death row until his trial approximately one year later.  Myers was transferred back to the Monroe County Jail for about four months but then was returned to Holman's death row.  McMillian alleges that Myers was transferred back and forth from death row depending on whether he cooperated with Tate, Ikner, and Benson's efforts to frame McMillian for the Morrison murder.  While McMillian and Myers were on death row, one inmate was executed in the electric chair.

Myers was the prosecution's key witness at McMillian's trial.  Neither the prosecution nor the defense called Kelly to testify.  The jury convicted McMillian of capital murder.  He was sentenced to death.

Eventually, Myers and several other witnesses recanted their trial testimony.  In addition, McMillian learned that the state had withheld exculpatory and impeachment evidence from him.  On McMillian's petition for post-conviction relief under Ala.R.Crim.P. 32, the Alabama Court of Criminal Appeals reversed McMillian's conviction because of the state's failure to disclose exculpatory and impeachment evidence.  *McMillian v. State,* 616 So.2d 933 (Ala.Crim.App.1993).  The state then dismissed the murder charge against McMillian and released him from prison.  This lawsuit

followed.

## II. PROCEDURAL HISTORY

McMillian brought suit pursuant to 42 U.S.C. § 1983 against Tate, Ikner, Benson, and various other defendants who are not parties to this appeal. In a twenty-seven count complaint, McMillian alleges violations of his federal constitutional rights, as well as pendent state constitutional and tort claims. On a motion to dismiss, the district court dismissed Monroe County, Alabama, and all official capacity claims, from the suit.[1] The court also dismissed many of the claims asserted against various defendants in their individual capacities. The remaining defendants later moved for summary judgment, asserting qualified immunity, among other defenses.

The district court granted summary judgment to various defendants on many of McMillian's claims. The court denied summary judgment, however, on a number of the claims against Tate, Ikner, and Benson. Because these claims form the basis of this appeal, we describe the district court's resolution of them on summary judgment in some detail.

A. *Count One: Pretrial Detention on Death Row*

In Count One, McMillian alleges that his incarceration on death row while a pretrial detainee violated his clearly established due process rights under the Fourteenth Amendment. McMillian alleges that Tate, Ikner, and Benson conspired with DOC officials to place and keep McMillian on death row prior to his

---

[1]In No. 95-6369, --- F.3d ----, also decided today, we address McMillian's permissive interlocutory appeal from the district court's order dismissing Monroe County from the suit.

trial. This pretrial detention on death row, McMillian avers, was for the purpose of punishing and intimidating him. The district court concluded that a genuine issue of fact exists as to whether Tate, Ikner, and Benson conspired to detain McMillian on death row for the purpose of punishing him rather than out of concern for his safety. Such a conspiracy, the court held, would violate McMillian's clearly established due process rights.

The district court found that, while it is undisputed that two armed men broke into the Conecuh County Jail and threatened Myers, a genuine issue of material fact exists as to whether the armed men made threats against McMillian. Tate, Ikner, and Benson claim that McMillian was threatened; Myers states in an affidavit that he never told them that McMillian was threatened. The district court determined that, if Myers is telling the truth, it would be reasonable to infer that Tate, Ikner, and Benson were not genuinely concerned with McMillian's safety and falsely told the district attorney that McMillian had been threatened and should be transferred from the county jails for his own safety.

The district court found that the evidence shows a genuine issue of fact as to the existence of a conspiracy between Tate, Ikner, and Benson, and DOC officials. There is evidence that Tate made threatening and hateful remarks to McMillian suggesting that Tate was more interested in punishing McMillian than in keeping him safe and secure. The DOC accepted custody of McMillian and Myers even though (1) the state court had no authority under Alabama law to order their transfers, (2) housing pretrial detainees violated DOC policy, and (3) housing pretrial detainees on death row was

unprecedented. In addition, Tate, Ikner, and Benson exercised some control over transfers to and from death row. While McMillian remained on death row, Myers was transferred back to the Monroe County jail and then returned to death row about four months later. The district court found that, drawing all inferences in favor of McMillian, the evidence with respect to the transfers supported two crucial points:

> First, the transferring of Myers to Monroe County Jail and back to Holman's Death Row, apparently without any written court orders, shows that there must have been some communication and understanding between Monroe County law enforcement officials and the D.O.C. Defendants about why such transfers were taking place and ultimately why McMillian and Myers were really being held on Death Row. Second, Myers' statement indicates that Defendants were using Death Row as a means to punish, intimidate, and coerce Myers to testify against McMillian. If Defendants were using Death Row to punish Myers, it is reasonable to infer that Death Row was also being used to punish McMillian.

(R. 7-127 at 32.)

B. *Count Two: Suppression of Exculpatory and Impeachment Evidence*

In Count Two, McMillian alleges that Tate, Ikner, and Benson suppressed and withheld exculpatory and impeachment evidence in violation of his due process rights under the Fourteenth Amendment. The district court found that McMillian had presented sufficient evidence to raise genuine issues of material fact as to whether Tate, Ikner, and Benson intentionally withheld three pieces of evidence from the prosecutor: the June 3, 1987, statement by Myers; a statement by an Isaac Daily; and a statement by a Miles Jackson. The district court rejected Tate, Ikner, and Benson's claims of qualified immunity, holding that intentionally withholding exculpatory and impeachment evidence from the prosecutor with no reason to believe that the prosecutor had or

knew of the evidence violated clearly established law.

1. *The June 3, 1987, Statement By Myers*

The district court found that the June 3, 1987, statement by Myers to Tate, Ikner, and Benson was exculpatory[2] for McMillian and that a genuine issue exists as to whether Tate, Ikner, and Benson intentionally withheld the statement from the prosecutor. In the statement, Myers denied being involved in the Morrison murder or knowing who committed the murder. He rejected repeated suggestions that McMillian had put him up to killing Morrison. He offered to take a polygraph test. The district court determined that the statement was clearly exculpatory because it contradicted the trial testimony of Myers, who was the prosecution's key witness against McMillian. The court found that the Morrison murder prosecutor never received the tape of the statement because it was placed in the Pittman murder file. The court concluded that a reasonable jury could infer from the circumstances that Tate, Ikner, and Benson intended to keep the statement from the Morrison prosecutor.

2. *The Isaac Daily Statement*

The district court found that a statement by Isaac Daily to Benson and the Escambia County district attorney was exculpatory for McMillian and that a genuine issue exists as to whether Benson intentionally withheld the statement from the prosecutor. Daily states that, while at the Monroe County Jail, he overheard Myers say that Myers and Kelly had killed Vicky Pittman and that Myers

---

[2]The district court's opinion uses the term "exculpatory" to refer to both exculpatory evidence and impeachment evidence that is required to be disclosed under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. We use the district court's terminology in describing its findings.

and Kelly were plotting to blame the Pittman murder on McMillian. The court determined that Daily's statement was clearly exculpatory because it showed that Myers was willing to falsely accuse McMillian of murder. The court found that the evidence is undisputed that the Morrison murder prosecutor never received the tape of the statement because it was placed in the Pittman murder file. The court concluded that a reasonable jury could infer from the circumstances that Benson intended to keep the Daily statement from the Morrison prosecutor. The court found no evidence that Tate and Ikner were involved in the suppression of the Daily statement.

3. *The Miles Jackson Statement*

The district court found that a statement by Miles Jackson to Alabama Bureau of Investigation agent Barnett was exculpatory for McMillian and that a genuine issue exists as to whether Tate, Ikner, and Benson intentionally withheld the statement from the Morrison prosecutor. Jackson stated that he was in Jackson Cleaners at 10:30 on the morning of the murder and that Ronda Morrison was alive and well. The court determined that the Jackson statement was clearly exculpatory because it undermined the prosecution's theory of the timing of Morrison's murder. The prosecution's theory was that the murder occurred between 10:15, when another witness saw Morrison alive, and 10:45 or 10:50, when Morrison was found dead. The district court reasoned that Myers's testimony as to the events of the morning sounded credible with a half-hour window but much less credible if the events must have occurred in fifteen minutes.

C. *Count Three:    Coercion of False Testimony*

In Count Three, McMillian alleges that Tate, Ikner, and Benson pressured various witnesses to give false testimony against McMillian and threatened various witnesses to keep them from giving exculpatory testimony for McMillian.  The district court found that McMillian had presented sufficient evidence to raise a genuine issue of fact as to whether Tate, Ikner, and Benson pressured Myers to testify falsely against McMillian.  Holding that clearly established law prohibited state officials from using perjured testimony to convict a defendant, the district court rejected Tate, Ikner, and Benson's motion for summary judgment based on qualified immunity.

The court also found a genuine issue as to whether Tate threatened Karen Kelly in an effort to influence her potential testimony.  The district court found that Kelly had initially implicated Myers, not McMillian, in the Morrison murder, and thus was a potential defense witness.[3]  The district court held that any interference with Kelly would be a per se violation of McMillian's clearly established right for his witnesses to be free from government interference.  That Kelly was not called to testify at trial is irrelevant, according to the district court.

D. *The State Law Claims*

The district court held that McMillian had presented sufficient evidence to raise a genuine issue of material fact for trial on McMillian's state law claims of malicious prosecution

---

[3]As we explain in section IV.E., the district court apparently misread the account of Kelly's statement.  Kelly was referring to the Pittman murder, not the Morrison murder.

(Count Twenty), abuse of process (Count Twenty-One), and outrage (Count Twenty-Six) against Tate, Ikner, and Benson. In addition, the court held that there is a genuine issue of fact on another outrage claim against Tate (Count Twenty-Five). The district rejected Tate, Ikner, and Benson's arguments that they are protected by state law immunity.

### III. ISSUES ON APPEAL

We address five issues on this appeal: (1) whether Tate, Ikner, and Benson are entitled to qualified immunity on McMillian's claim that their actions in causing his pretrial detention on death row violated his due process rights under the Fourteenth Amendment; (2) whether Tate, Ikner, and Benson are entitled to qualified immunity on McMillian's claim that they withheld exculpatory and impeachment evidence from him in violation of due process; (3) whether Tate, Ikner, and Benson are entitled to qualified immunity on McMillian's claim that they knowingly used Myers's perjured testimony to convict him in violation of due process; (4) whether Tate is entitled to qualified immunity on McMillian's claim that he intimidated Kelly into not giving exculpatory testimony; and (5) whether Tate is entitled to state law sovereign immunity on McMillian's state law claims.[4]

---

[4]In addition, Tate, Ikner, and Benson argue that: (1) they are entitled to quasi-judicial immunity on McMillian's claim that their actions in causing his pretrial detention on death row violated his due process rights under the Fourteenth Amendment; and (2) they are entitled to quasi-prosecutorial immunity on McMillian's claim that they withheld exculpatory evidence from the prosecutor in violation of due process. These arguments are meritless and do not warrant further discussion. *See* 11th Cir.R. 36-1.

Ikner and Benson also argue that the district court

## IV. DISCUSSION

### A. *General Principles of Qualified Immunity*

In all but exceptional cases, qualified immunity protects government officials performing discretionary functions[5] from the burdens of civil trials and from liability. *Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). Only when an official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known" is the official not protected by qualified immunity. *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). To be "clearly established," the law that the government official allegedly violated "must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing' violates federal law." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel ... the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Id.* at 1150. The plaintiff bears the burden of demonstrating that the defendant violated clearly established law.

---

erred in denying summary judgment on the state law tort claims in Count Twenty (malicious prosecution), Count Twenty-One (abuse of process), and County Twenty-Six (outrage). They raise various nebulous arguments about state law immunity. Their arguments are meritless and do not warrant further discussion. *See* 11th Cir.R. 36-1.

[5]It is undisputed that Tate, Ikner, and Benson were engaged in discretionary functions at all relevant times.

*Jordan v. Doe,* 38 F.3d 1559, 1565 (11th Cir.1994) (quotation marks and citation omitted).

B. *Scope of Appellate Jurisdiction Over Interlocutory Appeals of Denials of Qualified Immunity Defense*

A district court's order denying a defense of qualified immunity is an appealable final decision within the meaning of 28 U.S.C. § 1291 to the extent that it turns on a question of law. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). The Supreme Court recently construed this rule allowing immediate appeals of denials of qualified immunity to permit immediate appeals only of the purely legal issues of what law was "clearly established" and whether the facts alleged violate that law. *Johnson v. Jones,* --- U.S. ----, ----, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (citing *Mitchell,* 472 U.S. at 528 & n. 9, 105 S.Ct. at 2817 & n. 9). The Supreme Court held that when a district court denies summary judgment in a qualified immunity case based on its resolution of a fact-related dispute—such as whether the evidence is sufficient to show a genuine issue of fact for trial—the order is not an immediately appealable final decision. *Id.*

McMillian contends that many of the arguments that Tate, Ikner, and Benson raise on appeal are, in substance, challenges to the district court's resolution of factual disputes. As such, McMillian contends, these issues are not cognizable on this appeal under *Johnson v. Jones.* Though McMillian's argument finds some support in *Johnson,* this circuit has not construed *Johnson* to bar immediate appellate review of fact-based rulings in all circumstances, and the Supreme Court's subsequent decision in

*Behrens v. Pelletier,* --- U.S. ----, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), confirms that *Johnson* did not work such a constriction of interlocutory appellate jurisdiction over orders denying a qualified immunity defense.

In *Johnson v. Clifton,* 74 F.3d 1087 (11th Cir.1996), *petition for cert. filed,* (U.S. Apr. 25, 1996) (No. 95-1743), we held that an appellate court may address a district court's resolution of factual issues when the core qualified immunity issue is also raised on appeal from a denial of summary judgment. *Id.* at 1091. We reasoned that an appellate court may address the factual issue of what conduct the defendant engaged in because the issue is a necessary part of the core qualified immunity analysis of whether the defendant's conduct violated clearly established law. *Id. See also Cottrell v. Caldwell,* 85 F.3d 1480 (11th Cir.1996); *Dolihite v. Maughon,* 74 F.3d 1027, 1034 n. 3 (11th Cir.1996). If, as in *Johnson v. Jones,* only the factual issue of evidentiary sufficiency is raised on appeal, a final, collateral order is not being appealed, and the appellate court has no jurisdiction to hear the case. *Johnson v. Clifton,* 74 F.3d at 1091. But so long as the core qualified immunity issue is raised on appeal, a final, collateral order is being appealed, and the appellate court has jurisdiction to hear the case, including challenges to the district court's determination that genuine issues of fact exist as to what conduct the defendant engaged in. *Id.; Cottrell,* 85 F.3d at 1485-86.

Even when the core qualified immunity issue is raised, however, we may decline to review the district court's

determination of the facts for purposes of summary judgment. *See Johnson v. Clifton,* 74 F.3d at 1039. "[W]e are not required to make our own determination of the facts for summary judgment purposes; we have discretion to accept the district court's findings, if they are adequate." *Cottrell,* 85 F.3d at 1486, (citing *Johnson v. Jones,* --- U.S. at ----, 115 S.Ct. at 2159). We follow that approach here,[6] for the district court's determination of the genuine issues for trial is exhaustive and detailed. Rather than undertaking our own review of the record in the light most favorable to McMillian to determine the facts for purposes of summary judgment, we accept the district court's determination of the relevant facts for purposes of summary judgment and, using those facts, analyze whether Tate, Ikner, and Benson's conduct violated clearly established law. *See Cottrell,* 85 F.3d at 1486-87, (following same approach).

We emphasize that we accept the district court's determinations of the facts only for purposes of this interlocutory appeal. At trial, it may turn out that these "facts" are not the real "facts." As we explained in *Cottrell,*

> a defendant who does not win summary judgment on qualified immunity grounds may yet prevail on those grounds at or after trial on a motion for a judgment as a matter of law.... What we decide in this interlocutory appeal is only whether the district court should have granted *summary judgment* on qualified immunity grounds.

85 F.3d at 1487 (citations omitted) (quoting *Kelly v. Curtis,* 21

---

[6]We make one exception to this approach. The district court's finding as to the content of a statement by Karen Kelly appears to have been based entirely on a misreading of the record. The misreading is obvious, and McMillian does not dispute that the finding is based on a misreading. Thus, in section IV.E., we simply correct this mistake.

F.3d 1544, 1546-47 (11th Cir.1994)).  *Johnson v. Jones* does not affect the scope of appellate review after final judgment.

C. *Pretrial Detention on Death Row*

In Count One, McMillian alleges that his incarceration on death row while a pretrial detainee violated his clearly established due process rights.  McMillian alleges that Tate, Ikner, and Benson conspired with DOC officials to place and keep McMillian on death row prior to his trial for the purpose of punishing and intimidating him.

1. *McMillian States a Fourteenth Amendment Claim*

Tate contends that Count One does not state a Fourteenth Amendment claim.  "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  *Jordan,* 38 F.3d at 1564 (quoting *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)).  Thus, before we address whether Tate, Ikner, and Benson violated clearly established law in allegedly causing McMillian's confinement on death row, we examine McMillian's allegations to determine whether he asserts a cognizable constitutional claim.  *Id.*

Tate argues that McMillian cannot state a Fourteenth Amendment claim simply by showing that he, Ikner, and Benson subjectively intended to punish McMillian by causing his pretrial detention on death row.  According to Tate, McMillian states a Fourteenth Amendment claim only if the pretrial detention was not rationally

related to a legitimate non-punitive governmental objective. Tate, Ikner, and Benson argue that McMillian's transfer to death row was rationally related to the legitimate objective of ensuring McMillian's safety.

Due process prohibits a state from punishing a pretrial detainee at all until he is lawfully convicted of a crime. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979); *Hamm v. DeKalb County,* 774 F.2d 1567, 1572 (11th Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). To determine whether a condition of pretrial detention amounts to punishment, we must decide whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate governmental purpose. *Bell,* 441 U.S. at 538, 99 S.Ct. at 1873. Contrary to Tate's contention, a showing of an intent to punish suffices to show unconstitutional pretrial punishment. *Bell,* 441 U.S. at 538 & n. 20, 99 S.Ct. at 1873-74 & n. 20; *Hamilton v. Lyons,* 74 F.3d 99, 104 (5th Cir.1996) (stating that expressed intent by officers to punish pretrial detainee shows unconstitutional pretrial punishment); *Hause v. Vaught,* 993 F.2d 1079, 1085 (4th Cir.1993) (same), *cert. denied,* --- U.S. ----, 114 S.Ct. 712, 126 L.Ed.2d 668 (1994). An intent to punish may be inferred when a condition of pretrial detention is not reasonably related to a legitimate governmental goal; for example, an intent to punish may be inferred when the condition is excessive in relation to the legitimate purpose assigned to it. *Bell,* 441 U.S. at 538, 99 S.Ct. at 1874; *Hamilton,* 74 F.3d at 104.

The district court found that McMillian had presented

sufficient evidence to raise a genuine issue of fact as to whether Tate, Ikner, and Benson conspired to detain McMillian on death row for the purpose of punishing him. To the extent that Tate, Ikner, and Benson argue that McMillian was transferred for the purpose of ensuring his safety, they simply take issue with the district court's conclusion that McMillian has raised a genuine issue of fact as to whether the purpose of the transfer was punishment. As we have explained, we do not address on this appeal challenges to the district court's factual determinations. *See* section IV.B.[7] To the extent that Tate, Ikner, and Benson argue that a pretrial detainee may be subjected to adverse[8] conditions of confinement for the purpose of punishment so long as there is a legitimate alternative reason for the confinement, regardless of whether the legitimate reason in fact motivated the defendants' actions, they are simply wrong. An express purpose to punish establishes unconstitutional pretrial punishment. *Bell,* 441 U.S. at 538–39 & n. 20, 99 S.Ct. at 1873-74 & n. 20; *Hamilton,* 74 F.3d at 104; *Hause,* 993 F.2d at 1085.[9] Here, the district court concluded that

---

[7]For the same reason, we reject Ikner and Benson's contention that they played no role in McMillian's placement on death row. The district court found that a genuine issue exists as to whether Ikner and Benson lied about the results of their investigation of the break-in at the Conecuh County jail and conspired with Tate and DOC officials to put McMillian on death row.

[8]Tate suggests that being confined on death row is no worse than being confined at the local jail. Such a suggestion borders on the frivolous.

[9]Whether a condition of confinement is related to a legitimate governmental purpose is relevant as circumstantial evidence of whether the condition was imposed for the purpose of punishment. At trial, Tate, Ikner, and Benson may present evidence and argue that they transferred McMillian to death row

McMillian had presented sufficient evidence of a purpose to punish to satisfy his burden on summary judgment. Therefore, we hold that McMillian states a claim for unconstitutional pretrial punishment.

2. *Clearly Established Law Prohibited Placing a Pretrial Detainee on Death Row for the Purpose of Punishment*

Qualified immunity shields Tate, Ikner, and Benson from the burdens of trial and from liability unless transferring McMillian to death row for the purpose of punishment violated clearly established law. *Lassiter,* 28 F.3d at 1149. Tate, Ikner, and Benson argue that the law governing whether conditions of confinement amount to pretrial punishment was not clearly established at the time of McMillian's transfer.

When McMillian was transferred to Holman's death row, clearly established law in this circuit prohibited imposing on a pretrial detainee conditions of detention that amount to punishment. *See Bell,* 441 U.S. at 535, 99 S.Ct. at 1872; *Hamm,* 774 F.2d at 1572. The issue for qualified immunity purposes, however, is not whether the due process right not to be punished before conviction was clearly established. The proper inquiry is whether it was clearly established that transferring a pretrial detainee to death row for the purpose of punishment violates due process.

To be "clearly established," the law that the government official allegedly violated "must have earlier been developed in such a concrete and factually defined context to make it obvious to

---

not to punish him but rather for the legitimate purpose of ensuring his safety. Defendants cannot, however, obtain summary judgment simply by arguing that a legitimate purpose for the transfer exists when there is a genuine issue as to whether McMillian was transferred for that legitimate purpose or for the unconstitutional purpose of punishment.

all reasonable government actors, in the defendant's place, that "what he is doing' violates federal law." *Lassiter,* 28 F.3d at 1149 (quotation marks and citation omitted). We have found no case with facts similar to McMillian's allegations. The pre-existing case law prohibiting conditions of pretrial detention that amount to punishment involved conditions such as double-bunking, mail restrictions, search policies, *Bell,* 441 U.S. 520, 99 S.Ct. 1861, overcrowding, unsanitary food, and lack of adequate medical care, *Hamm,* 774 F.2d 1567.

Nevertheless, for the law to be clearly established, a court need not have found the very action in question unlawful; what is essential is that the action's unlawfulness be apparent in light of pre-existing law. *Jordan,* 38 F.3d at 1566. We do not view the absence of a case factually similar to the extraordinary allegations in this case as an indication that the law was not clearly established that confining a pretrial detainee on death row to punish him is unconstitutional. *Bell* 's prohibition on *any* pretrial punishment, defined to include conditions imposed with an intent to punish, should have made it obvious to all reasonable officials in Tate, Ikner, and Benson's place that holding McMillian on death row to punish him before he was tried violated McMillian's due process rights. If McMillian's allegations are true, Tate, Ikner, and Benson violated McMillian's clearly established constitutional rights. Therefore, they are not entitled to summary judgment based on qualified immunity.

Tate contends that his purpose in causing McMillian's detention on death row may not be considered in determining whether

he is entitled to qualified immunity. According to Tate,*Harlow* 's objective reasonableness standard precludes any inquiry into a defendant's subjective intent, even when intent is an element of the underlying constitutional claim. Thus, Tate argues that we must ignore the existence of a genuine issue as to whether defendants transferred McMillian to death row for the purpose of punishment. The only question for purposes of qualified immunity, Tate contends, is whether a "reasonable officer, knowing what Tate knew about the Conecuh County break-in, could have thought it lawful to request McMillian's transfer." (Appellant Tate's Br. at 38.) In other words, Tate contends that he is entitled to qualified immunity if some reasonable official, acting with no intent to punish McMillian, could have thought it lawful to transfer McMillian to death row in light of the break-in.

Our precedent compels us to reject Tate's contention. Like every other circuit that has considered the issue, we have held that intent or motivation may not be ignored when intent or motivation is an essential element of the underlying constitutional violation. *Edwards v. Wallace Community College,* 49 F.3d 1517, 1524 (11th Cir.1995).[10] A purpose to punish is an essential element

---

[10]*Accord, Tompkins v. Vickers,* 26 F.3d 603, 607 (5th Cir.1994); *Branch v. Tunnell,* 937 F.2d 1382, 1385-86 (9th Cir.1991); *Auriemma v. Rice,* 910 F.2d 1449, 1453 (7th Cir.1990) (en banc), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991); *Siegert v. Gilley,* 895 F.2d 797, 801-812 (D.C.Cir.1990), *aff'd on other grounds,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Poe v. Haydon,* 853 F.2d 418, 431 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Turner v. Dammon,* 848 F.2d 440, 445 n. 3 (4th Cir.1988); *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 648 (10th Cir.1988); *Musso v. Hourigan,* 836 F.2d 736, 743 (2nd Cir.1988).

of a pretrial punishment claim under the Fourteenth Amendment. Hence, Tate, Ikner, and Benson's purpose must be considered in this case, just as discriminatory intent must be considered when an equal protection violation is asserted, *see Ratliff v. DeKalb County, Ga.,* 62 F.3d 338, 341 (11th Cir.1995); *Edwards,* 49 F.3d at 1524, and intent or motivation must be considered when certain First Amendment claims are asserted, *see, e.g., Tompkins,* 26 F.3d at 607 (alleged retaliatory transfer of government employee); *Losavio,* 847 F.2d at 648 (alleged interference with speech); *Musso,* 836 F.2d at 743 (alleged content-based censorship at school board meeting). When Tate, Ikner, and Benson's purpose to punish is considered, there is no question that their alleged conduct violated clearly established law.[11]

D. *Suppression of Exculpatory and Impeachment Evidence*

In Count Two, McMillian alleges that Tate, Ikner, and Benson withheld exculpatory and impeachment evidence in violation of his due process rights under the Fourteenth Amendment. The district court found that McMillian had presented sufficient evidence to

---

Tate acknowledges our precedent and this overwhelming persuasive authority but contends that the *Edwards* court and all of the other courts that have considered the issue are wrong. We are bound by *Edwards* and, in any event, are unpersuaded by Tate's argument.

[11]We note that neither Tate, Ikner, nor Benson contends that the district court applied the wrong standard on summary judgment in evaluating McMillian's evidence of their purpose. Therefore, we need not address the quantum or quality of evidence of intent necessary to overcome a defendant's motion for summary judgment when the motion is based on qualified immunity grounds. *See, e.g., Tompkins,* 26 F.3d at 608-609; *Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 512 (6th Cir.), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Losavio,* 847 F.2d at 649.

raise genuine issues of material fact as to whether Tate, Ikner, and Benson intentionally withheld several pieces of exculpatory and impeachment evidence from the Morrison prosecutor.  The district court rejected defendants' claims of qualified immunity, holding that intentionally withholding exculpatory or impeachment evidence from the prosecutor with no reason to believe that the prosecutor had or knew of the evidence violated clearly established law under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

1. *McMillian States a Claim for a Brady Violation*[12]

Brady protects an accused's due process right to a fair trial.  *Id.* at 87, 83 S.Ct. at 1197.  In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence

---

[12]We note that neither Tate, Ikner, nor Benson question whether a claim for a *Brady* violation may be asserted under § 1983.  Though we have never explicitly addressed whether claims for *Brady* violations are cognizable under § 1983, several other circuits have permitted § 1983 suits for money damages to be asserted for *Brady* violations.  *See, e.g., Carter v. Burch,* 34 F.3d 257, 263-64 (4th Cir.1994) (affirming jury verdict against police officer for withholding exculpatory evidence that should have been disclosed under *Brady* ), *cert. denied,* --- U.S. ----, 115 S.Ct. 1101, 130 L.Ed.2d 1068 (1995); *McDonald v. State of Illinois,* 557 F.2d 596, 603 (7th Cir.) (holding that *Brady* violation states claim under § 1983), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977); *Hilliard v. Williams,* 516 F.2d 1344, 1349-50 (6th Cir.1975) (holding that allegation that state investigator withheld exculpatory evidence in violation of *Brady* states § 1983 claim), *vacated on other grounds,* 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976), *on remand,* 540 F.2d 220, 222 (1976) (affirming judgment against investigator); *Carter v. Harrison,* 612 F.Supp. 749, 758 (E.D.N.Y.1985) (holding that claim against police officer for failing to turn exculpatory evidence over to prosecutor is cognizable under § 1983).  We agree that § 1983 provides a cause of action for a violation of the due process right to a fair trial that is protected by *Brady.*

is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.,* 373 U.S. at 87-91, 83 S.Ct. at 1197-98. *Brady* requires disclosure of both exculpatory and impeachment evidence that is material. *See Giglio v. United States,* 405 U.S. 150, 153-54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Evidence is material if its suppression undermines confidence in the outcome of the trial. *Kyles v. Whitley,* --- U.S. ----, ----, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

The Supreme Court has not explicitly addressed the disclosure duties of the police and other investigators under *Brady.* This court has noted, however, that investigators have no duty to disclose exculpatory and impeachment evidence to the defense. *Kelly v. Curtis,* 21 F.3d at 1552.[13] The Constitution imposes the duty to disclose exculpatory and impeachment evidence to the defense on the prosecutor. *Id.* *See also Walker v. City of New York,* 974 F.2d 293, 299 (2nd Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993).[14] Investigators satisfy

---

[13]Though *Kelly* was a § 1983 action for illegal detention, not for a *Brady* violation, we drew on *Brady* principles to define a police officer's duties to disclose evidence.

[14]The Second Circuit has advanced sound reasons for placing the obligation to disclose evidence to the defense on the prosecutor:

> It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense. A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion. It also would ignore the fact that the defendant's appropriate point of contact with the government during litigation is the prosecutor

their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor. *Walker,* 974 F.2d at 299; *Jones v. City of Chicago,* 856 F.2d 985, 995 (7th Cir.1988). If they have reason to believe that the prosecutor already has the exculpatory and impeachment evidence, though, investigators have no duty to disclose the evidence. *Kelly,* 21 F.3d at 1552.

On appeal, neither Tate, Ikner, nor Benson disputes that an investigator has a duty under *Brady* to turn exculpatory and impeachment evidence over to the prosecutor. Nor do they dispute that the evidence that they allegedly suppressed was *Brady* material. Instead, Tate argues that he had reason to believe that the prosecutor knew about the exculpatory and impeachment evidence because Ikner, the prosecutor's investigator, knew of the evidence. Ikner and Benson argue that *Brady* did not require them to turn the evidence at issue over to the prosecutor in the circumstances of this case.[15] Ikner and Benson also argue that they could not have known, when they acquired the evidence, that the evidence would turn out to be exculpatory.

In arguing that he had reason to believe that the prosecutor was aware of the exculpatory and impeachment evidence, Tate relies on our decision in *Kelly v. Curtis,* 21 F.3d 1544. Plaintiff in *Kelly* sued three police detectives under § 1983 for illegal

---

and not those who will be witnesses against him.

*Walker,* 974 F.2d at 299.

[15]Ikner and Benson also dispute the district court's determination that a genuine issue exists as to whether they intentionally withheld evidence. As we have explained, we do not address on this appeal challenges to the district court's fact-based rulings. *See* section IV.B.

detention, among other claims.  Plaintiff had spent a year in jail on drug charges that eventually were dropped.  He alleged that the detectives concealed from the prosecutor a lab report revealing that the substance on his possession was not cocaine.  The district court denied the detectives' motion for summary judgment, holding that the detectives had a legal obligation to ensure that the judge or prosecutor was aware of all exculpatory evidence.  *Id.* at 1549. We reversed, holding that the police have no duty to disclose exculpatory evidence when they have reason to believe that the prosecutor already is aware of the evidence.  *Id.* at 1552.  In *Kelly,* the detectives had reason to believe that the prosecutor was aware of the lab report because the report listed the district attorney's office as a recipient and the state lab had a practice of sending a copy directly to the prosecutor.  *Id.*

Tate argues that he had even more reason to believe that the prosecutor was aware of the exculpatory and impeachment evidence than the detective in *Kelly* because Ikner, who was part of the prosecutor's office, knew of the evidence.  We agree that a prosecutor's investigator's awareness of exculpatory or impeachment evidence usually will give other investigators reason to believe that the prosecutor is aware of the evidence.  But Tate cannot avail himself of that argument, for he allegedly conspired with Ikner to withhold the evidence from the prosecutor.  Thus, far from having reason to believe that the prosecutor was aware of the evidence, Tate allegedly knew that the prosecutor was not aware of the evidence.  *Kelly,* therefore, is inapplicable to this case.

Ikner and Benson argue that they did not violate *Brady*

because the exculpatory and impeachment evidence was acquired during the Pittman murder investigation rather than during the Morrison investigation. Thus, they argue, the evidence properly was left in the Pittman file rather than in the Morrison file. This argument is meritless. Ikner and Benson were investigating the Pittman murder contemporaneously with the Morrison murder. McMillian and Myers were charged in both murders. Regardless of which murder was being investigated at the precise moment the evidence was acquired, Ikner and Benson had an obligation under *Brady* to give evidence that was favorable to McMillian in the Morrison murder to the Morrison prosecutor.[16]

2. *Clearly Established Law Prohibited Police Suppression of Exculpatory and Impeachment Evidence*

Tate, Ikner, and Benson are protected by qualified immunity unless their actions violated clearly established law. Pre-existing law as of 1987 and 1988, when they acted, must have made it obvious to every like-situated, reasonable government agent that withholding the exculpatory and impeachment evidence from the Morrison murder prosecutor violated federal law in the circumstances. *Lassiter,* 28 F.3d at 1150. Citing the Fifth Circuit's decision in *Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir.1988), the district court held that in 1987 and 1988 a

---

[16]Ikner and Benson also argue that they reasonably could have believed that McMillian's attorneys, who were representing him in both the Morrison murder and the Pittman murder, would pursue discovery in the Pittman murder and thus find in the Pittman file the material favorable to McMillian in the Morrison murder. This argument should be addressed to the factfinder at trial; the district court determined that there is evidence that Ikner and Benson placed the evidence in the Pittman file for the purpose of concealing it from McMillian.

police officer had a clearly established duty under *Brady* to not intentionally withhold exculpatory or impeachment evidence from the prosecutor.

We agree with the Fifth Circuit that clearly established law in 1987 and 1988 prohibited the police from concealing exculpatory or impeachment evidence. *See Geter,* 849 F.2d at 1559.[17] *Brady* and its progeny made clear that an accused's due process rights are violated when the prosecution fails to disclose exculpatory or impeachment evidence to the defense, regardless of whether the prosecutor himself acted in bad faith or even knew of the evidence. *See Giglio v. United States,* 405 U.S. at 153-54, 92 S.Ct. at 766. Our case law clearly established that an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence. *Freeman v. State of Georgia,* 599 F.2d 65, 69 (5th Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 641 (1980).[18] We had explained:

> The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure ... The duty to disclosure [sic] is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.

*Id.* at 69-70 (citations omitted). *See also Ross v. Hopper,* 716 F.2d 1528, 1534 (11th Cir.1983) (holding that any information

---

[17]*Geter* itself cannot clearly establish that Tate, Ikner, and Benson had a duty to turn the exculpatory and impeachment evidence over to the prosecutor because *Geter* was decided by another circuit.

[18]Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding on this court. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

obtained by law enforcement officers in course of investigation must be attributed to prosecutor for purposes of *Brady* violation); *United States v. Antone,* 603 F.2d 566, 569-70 (5th Cir.1979) (imputing knowledge of state investigators to federal prosecutors in determining whether there was *Brady* violation). Thus, pre-existing law in this circuit clearly established that withholding *Brady* material from the prosecutor, and thus preventing its disclosure to the defense, violates an accused's due process rights.[19]

Our conclusion that Tate, Ikner, and Benson's duties under *Brady* were clearly established does not end the inquiry. It remains to be determined whether a reasonable officer in Tate, Ikner, and Benson's position would know, when they acted, that the evidence withheld from the prosecutor was material, that is, that withholding the evidence would undermine confidence in the outcome of McMillian's trial. For if a reasonable officer would not know that the exculpatory and impeachment evidence was material, he

---

[19]Though we had made it clear that the police cause a *Brady* violation by withholding material exculpatory or impeachment evidence, we had never squarely held that it is the police who violate *Brady,* as opposed to "the state," when the police fail to turn exculpatory evidence over to the prosecutor. Several other courts had held that the police violate *Brady* by failing to give exculpatory or impeachment evidence to the prosecutor. *See Hilliard v. Williams,* 516 F.2d at 1349-50; *Carter v. Harrison,* 612 F.Supp. 749, 757-58 (E.D.N.Y.1985). *See also Campbell v. State of Maine,* 632 F.Supp. 111, 121-22 (D.Me.1985) (noting that police officer in possession of exculpatory evidence has duty to turn it over to prosecutor), *aff'd,* 787 F.2d 776 (1st Cir.1986); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 389 (D.N.J.1983) (noting that police have duty to disclose exculpatory evidence to the prosecutor), *aff'd,* 770 F.2d 1070 (3rd Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986). Neither Tate, Ikner, nor Benson contend that the absence of such a holding in this circuit rendered their duties under *Brady* any less clearly established.

would not know that "what he is doing" violates federal law in the circumstances. *See Lassiter,* 28 F.3d at 1149.

The standard of materiality at the time Tate, Ikner, and Benson acted is the same standard applicable today. *See Kyles v. Whitley,* --- U.S. at ---- - ----, 115 S.Ct. at 1565-66. Evidence is material and therefore must be disclosed if there is a reasonable probability that, if the evidence is suppressed, the result of the proceeding will be different. *Id.* at ----, 115 S.Ct. at 1565 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). A reasonable probability of a different result is shown when the suppression of evidence would undermine confidence in the outcome of the trial. *Id.* at ----, 115 S.Ct. at 1566 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381). In evaluating materiality, suppressed evidence must be evaluated collectively, not item-by-item. *Id.* at ----, 115 S.Ct. at 1567.

The district court held that several pieces of withheld evidence were clearly exculpatory.[20] However, the district court did not ask whether every reasonable official in the position of Tate, Ikner, and Benson would understand that withholding those particular pieces of evidence would undermine confidence in the outcome of McMillian's trial. The court viewed the evidence with the benefit of hindsight, knowing what evidence actually was presented at trial, and agreed with the Alabama Court of Criminal Appeals that the evidence withheld was material. But Tate, Ikner,

---

[20]The district court's opinion uses "clearly exculpatory" to refer to both exculpatory and impeachment evidence required to be disclosed under *Brady.*

and Benson did not have the benefit of knowing exactly how the totality of the evidence would play out at trial. It is from their perspective that the district court should have analyzed whether the evidence was material, and we remand for the district court to do so.[21]

E. *Coercion of False Testimony*

The district court found that McMillian had presented sufficient evidence to raise a genuine issue of material fact as to whether Tate, Ikner, and Benson coerced Myers into testifying falsely against McMillian. The court reasoned that if Tate, Ikner, and Myers indeed coerced Myers into perjuring himself, they knew that Myers's testimony was false, and thus may be liable for causing the state to use perjured testimony to convict McMillian. The court rejected Tate, Ikner, and Benson's qualified immunity defense because it concluded that clearly established law prohibited state officials from knowingly using perjured testimony to convict a defendant.

On appeal, Tate contends that his actions did not cause a violation of clearly established law. We disagree. Clearly established law prohibited a state from knowingly using perjured testimony. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct.

---

[21]We are unable to determine from the complaint and record exactly when it is that McMillian alleges that Tate, Ikner, and Benson should have realized that the withheld evidence was material. It is not clear whether McMillian's claim is that Tate, Ikner, and Benson should have realized the evidence's materiality when they acquired it, sometime later but before trial, at trial as the evidence unfolded, or after trial. On remand, the district court will have to determine McMillian's precise claim before deciding whether a reasonable official would have known that the suppressed evidence was material.

1173, 1177, 3 L.Ed.2d 1217 (1959); *Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 178-79, 87 L.Ed. 214 (1942); *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935). Tate contends that the facts of these cases are not materially similar to the facts here. Again, we disagree. The material fact, in those cases and here, is that there is evidence that the state knowingly used perjured testimony.[22] If McMillian's allegations are true, every reasonable official should have known that coercing Myers to testify falsely would violate McMillian's constitutional rights.

Tate, Ikner, and Benson contend that Myers's testimony was not false and, even if it was, they could not have known that it was false. However, the district court found that genuine issues of fact exist as to whether Tate, Ikner, and Benson pressured Myers into testifying falsely and as to whether he testified falsely. As we have explained, we do not address challenges to such factual rulings by the district court on this appeal. *See* section IV.B.

The district court also found that McMillian had presented

---

[22]Tate contends that these cases established the standard for "knowing use of perjured testimony" in criminal cases. He argues that the standard for § 1983 liability for using perjured testimony is different and, in any event, was not clearly established. We disagree.

*Napue, Pyles,* and *Mooney* clearly established the law. To the extent that Tate argues that we must look solely to § 1983 cases to discover clearly established law, his argument is frivolous. Tate is correct to the extent that he argues that an official will not always be subject to § 1983 liability for violating constitutional rights. But that is because he is protected by qualified immunity, not because constitutional standards vary depending on whether a constitutional violation is alleged in a criminal proceeding or a § 1983 action.

sufficient evidence to raise a genuine issue of fact as to whether Tate threatened Karen Kelly. The district court described Kelly as a potential defense witness because she initially implicated Myers, but not McMillian, in the Morrison murder. The court found it irrelevant that the defense never called nor intended to call Kelly to testify. The court held that clearly established law prohibited the state from interfering with defense witnesses.

Tate contends that McMillian has failed to state a claim for a constitutional violation because McMillian has not alleged that Kelly could have given any testimony favorable to McMillian. He argues that there is no evidence in the record that Kelly initially implicated only Myers in the Morrison murder. Tate contends that the district court mistakenly read a statement by Kelly about the Pittman murder to refer to the Morrison murder. McMillian does not deny that the district court misread the account of Kelly's statement. Instead, McMillian argues that the district court's ruling is a fact-based ruling that we may not address on this appeal under *Johnson v. Jones.*

In this instance only, we depart from our approach of not reviewing the district court's determination of the facts for purposes of summary judgment. The district court's determination appears to be based entirely on a misreading of an account of a statement by Kelly. In it, Kelly initially implicates only Myers in the *Pittman* murder, but the district court read the account to refer to the Morrison murder. McMillian does not contend that the district court did not misread the account, and he points to no other evidence that Kelly was a potential defense witness. Indeed,

McMillian's complaint does not even mention Kelly.  Thus, because Kelly was not a potential defense witness, Tate did not violate McMillian's clearly established rights in allegedly threatening Kelly.  We hold that the district court erred in denying summary judgment on the claim that Tate interfered with Kelly's potential testimony.

F. *Tate's Sovereign Immunity From State Law Claims*

The district court found that McMillian had presented sufficient evidence to create a genuine issue of material fact on three state law claims against Tate, Ikner, and Benson:  malicious prosecution (Count Twenty);  abuse of process (Count Twenty-One); and outrage (Count Twenty-Six).  In addition, the court found that a genuine issue exists as to a state law outrage claim against Tate and the DOC defendants (Count Twenty-Five).  The court rejected Tate's state law sovereign immunity and state law discretionary immunity defenses, holding that neither form of state law immunity shields officials sued for intentional or malicious wrongdoing in their individual capacities.

On appeal,[23] Tate contends that Alabama sheriffs are protected by sovereign immunity under § 14 of the Alabama Constitution, even when they are sued in their individual capacities for malicious or intentional wrongdoing.[24]  According to Tate, a suit may be

[23]We have jurisdiction over this appeal from the district court's denial of state law immunity because the state law immunity asserted is an immunity against suit.  *See Griesel v. Hamlin,* 963 F.2d 338, 340-41 (11th Cir.1992).

[24]We note that Tate does not contend that the district court erred in denying him discretionary immunity under Alabama law. In addition, we reject as meritless Tate's contention that the Eleventh Amendment bars suit against him in his individual

maintained against a sheriff only if it falls within one of five limited categories.[25]  It is undisputed that McMillian's claims do not fall within any of the five categories.

We do not read the cases that Tate cites to establish that he is immune from suit for the acts alleged in this case.  The Alabama Supreme Court cases establishing categories of suits that may be maintained against state officials warn that the categories do not exhaust the types of suits against state officials that are permissible under § 14 of the Alabama Constitution.  *Gill v. Sewell,* 356 So.2d 1196, 1198 (Ala.1978) ("This list was never intended to be a comprehensive final list of those actions not barred by Section 14.");  *Aland v. Graham,* 287 Ala. 226, 250 So.2d 677, 679 (1971) ("Without professing to cover every situation that has arisen, there are four general categories of actions that we have held do not come within the prohibition of Sec. 14.").  More importantly, the cases on which Tate relies recognize that sovereign immunity applies only when a suit against a state official "is, in effect, one against the State."  *Karrick v.*

---

capacity.

[25]Quoting *Parker v. Amerson,* 519 So.2d 442, 442–43 (Ala.1987), Tate argues that a sheriff

> is immune from suit under Article I, § 14, Alabama Constitution of 1901, in the execution of the duties of his office, except for actions brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute.

*Johnson,* 659 So.2d 77, 79 (Ala.1995); *Alexander v. Hatfield,* 652 So.2d 1142, 1143 (Ala.1994).

McMillian's claims are against Tate in his individual capacity. While § 14 "cannot be circumvented by suing the official or agent individually," *Milton v. Espey,* 356 So.2d 1201, 1202 (Ala.1978), § 14 does not necessarily immunize state officers from individual civil liability. *Id.* at 1203; *Gill,* 356 So.2d at 1198. "[A] state official may not escape individual liability for his tort by arguing that his mere status as a state official cloaks him with the state's constitutional immunity." *Barnes v. Dale,* 530 So.2d 770, 781 (Ala.1988) (quotation marks and citation omitted). To determine whether McMillian's suit is, in effect, against the state and thus barred, we must consider the nature of the suit and the relief demanded. *Phillips v. Thomas,* 555 So.2d 81, 83 (Ala.1989); *Gill,* 356 So.2d at 1198; *Aland,* 250 So.2d at 679.[26]

---

[26]Tate suggests that a suit against a sheriff always is a suit against the state. One of the cases on which Tate relies has language supporting that proposition. *See Amerson,* 519 So.2d at 446 ("This Court has specifically held that a suit against a sheriff is "essentially a suit against the state' and thus "not maintainable.' ") (citing *Montiel v. Holcombe,* 240 Ala. 352, 199 So. 245 (1940)). We do not read *Amerson* to establish such an absolute proposition because *Amerson* 's citation to *Montiel* suggests a much more limited reading. *Montiel* simply held that a suit against a sheriff to enjoin a criminal prosecution was essentially a suit against the state. *Montiel,* 199 So. at 245.

Tate also relies on our decision in *Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1523 (11th Cir.1990). *Carr,* however, addressed an Alabama sheriff's immunity from suit in his *official* capacity under the Eleventh Amendment. It is true that we drew on state law regarding a sheriff's immunity from suit under the Alabama Constitution. But our analysis in *Carr,* and the analysis in the cases that we cited, focused on suits against sheriffs in their official capacities. Here, in contrast, the suit is against Tate in his individual capacity.

As the district court emphasized, McMillian's suit alleges intentional, malicious wrongdoing.  The Alabama Supreme Court has held on several occasions that the defense of sovereign immunity does not bar suits against state officers for torts committed willfully, maliciously, and outside the scope of their authority. *Lumpkin v. Cofield,* 536 So.2d 62, 65 (Ala.1988) (citing *Barnes v. Dale,* 530 So.2d 770 (Ala.1988); *DeStafney v. University of Alabama,* 413 So.2d 391 (Ala.1981); *Milton,* 356 So.2d 1201 (Ala.1978); *Unzicker v. State,* 346 So.2d 931 (Ala.1977)). According to the Alabama Supreme Court, "Clearly, a state officer or employee is not protected by § 14 when he acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law." *Phillips,* 555 So.2d at 83 (citations omitted).  We think that the same rule applies to a suit against a sheriff so long as it is not, in effect, a suit against the state, notwithstanding that none of these cases involved sheriffs.

Tate cites a number of cases affording sheriffs sovereign immunity, but only two even arguably may be read to afford immunity to a sheriff for willful or malicious wrongdoing.  *Karrick,* 659 So.2d 77, involved a malicious prosecution claim,[27] and *Alexander,* 652 So.2d 1142, involved a negligent and/or bad faith service of process claim.  *Karrick* relied on *Alexander* for the proposition that a sheriff enjoys sovereign immunity when sued in his official capacity or when the suit is in effect against the state.  In

_____

[27]*Karrick* also involved a false imprisonment claim, but that claim was dismissed because the arrest was made pursuant to a lawfully issued warrant.  659 So.2d at 79.

*Alexander,* the court noted that a sheriff is immune when sued in his individual capacity if the suit is in effect against the state. But the court did not analyze whether the negligent and/or bad faith service of process claim was in effect a claim against the state. 652 So.2d at 1143.

We do not read *Karrick* or *Alexander* as holding that claims against sheriffs for willful and malicious conduct always are claims against the state barred by sovereign immunity. The issue was not even addressed in either case. Though claims of malicious prosecution and bad faith service of process would suggest willful and malicious conduct, an examination of the allegations in *Karrick* and *Alexander* reveals no such conduct.[28] And in neither case did the plaintiff argue that sovereign immunity was inapplicable because the defendant engaged in willful or malicious wrongdoing. We do not think that the Alabama Supreme Court would *sub silentio* excuse sheriffs from its oft-repeated rule that sovereign immunity does not protect an official from liability for willful or malicious wrongdoing. We hold, therefore, that state law sovereign immunity does not bar McMillian's claims against Tate.

## V. CONCLUSION

We vacate the district court's order denying summary judgment on the claim that Tate, Ikner, and Benson violated clearly

---

[28]The deputy sheriff in *Karrick* arrested the plaintiffs for altering a prescription. The deputy acted pursuant to a lawful arrest warrant and after a drug store had notified him that the prescription was altered. 659 So.2d at 78-79. The deputy sheriff in *Alexander* attempted to serve process on the plaintiff by leaving papers with the personnel manager at plaintiff's workplace, as was the deputy's fourteen-year-old practice when serving process at that particular plant. The plaintiff denied receiving the papers. 652 So.2d at 1143.

established law in withholding exculpatory and impeachment evidence from the prosecutor and remand for the district court to determine whether a reasonable official in Tate, Ikner, and Benson's position would have known that the withheld evidence was material. We reverse the district court's order denying summary judgment on the claim that Tate violated McMillian's clearly established rights in threatening Kelly. In all other respects, we affirm the district court.

AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART AND REMANDED.

PROPST, District Judge, concurring in part and dissenting in part:

I concur in the court's opinion, except as to the holding in the last paragraph of section IV.D.2. There, the court holds that the district court erred in assessing the evidence's materiality from a post-trial perspective rather than from the perspective of a reasonable official in the position of Tate, Ikner, and Benson. I think that the district court implicitly, if not explicitly, considered "whether every reasonable official in the position of Tate, Ikner, and Benson would understand that withholding those particular pieces of evidence would undermine confidence in the outcome of McMillian's trial." It is hard to see how a holding that evidence is "clearly exculpatory" could suggest anything else.